Maurice D. SCANLON, Defendant,
Appellant,

v.

UNITED STATES of America,
Appellee.

No. 4877.

United States Court of Appeals
First Circuit.

June 13, 1955.

Stanley M. Brown, Manchester, Mc-Lane, Carleton, Graf, Greene & Brown, Manchester, on the brief, for appellant.

Maurice P. Bois, U. S. Atty., Manchester, Burton L. Williams, Trial Atty., Internal Revenue Service, Boston, Mass., on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

██ This is an appeal from a judgment of the United States District Court for the District of New Hampshire entered April 14, 1954, sentencing the defendant to imprisonment for a period of fifteen months on each of two counts of an indictment for violations of § 145(b) of the Internal Revenue Code of 1939,[1] said prison sentences to run concurrent-

---

1. 26 U.S.C. § 145(b) (1946), 53 Stat. 62 (1939)

"§ 145. Penalties

* * * * *

"(b) *Failure to collect and pay over tax, or attempt to defeat or evade tax.*

ly, and to a fine of $2,500.00 on each count. The first count of the indictment refers to an individual return for calendar year 1947 and the second count to a joint return for calendar year 1948. The trial was before a jury, and following the Government's presentation of its case, which was based on the net worth and expenditures method, the defendant moved to strike certain evidence and for judgment of acquittal. Both motions were denied. The defendant chose not to present any evidence following the denial of these motions.

The defendant bases his appeal on several grounds. We shall deal first with his objections to the admission of certain evidence during the course of the trial.

Prior to the trial the defendant unsuccessfully sought to have suppressed a net worth statement signed and sworn to by him on August 20, 1952. He later objected to its admission during the trial on the same grounds as were advanced by him at the hearing on the motion. It seems from the record of the hearing on the defendant's motion to suppress evidence, which is somewhat confusing on this point, that the defendant was not warned during the pre-trial investigation that any statements made by him might be used against him. This net worth statement was signed at the request of Edward M. Vytal, an Internal Revenue agent, but there is no evidence that there was any duress, coercion, fraud or trickery employed by the Government in obtaining it and the trial court so found.

The defendant has cited two cases as recognizing a duty imposed on the Government to warn a person whose taxes are being investigated of his right against self-incrimination. However, in the first of these cases, Montgomery v. United States, 5 Cir., 1953, 203 F.2d 887,

although the court reversed the conviction of the appellant because of certain errors in the conduct of the trial, it held that even though a Special Agent of the Government testified that no warning at any time was given to the appellant that a Government exhibit based upon statements and admissions made to the Special Agent by the appellant and documents surrendered to the Special Agent by the appellant was admissible. The court further held that such documents were admissible as evidence themselves, stating at page 893: "We do not think the circumstances under which the statements of the defendant and of his wife, and the cancelled checks and documents, were obtained were sufficient of themselves to require that that evidence be excluded on the ground of being involuntary as a matter of law, or to require that the Government's Exhibit No. 20 based in part upon such testimony be not admitted in evidence. All of those circumstances were matters which went to the weight or credibility of the testimony thus obtained. * * *" It is to be noted that in the Montgomery case a Special Agent obtained the questioned documents but that in the instant case it was a Revenue Agent, Vytal, who procured the defendant's signature on the net worth statement. From the testimony before us it appears that a Special Agent at least in some cases carries on the investigation originally begun by a Revenue Agent. It is not improbable that in the Montgomery case the questioned documents were obtained at a stage of the investigation much nearer to actual criminal prosecution than in the instant case.

The second case cited by the defendant in support of his contention that the net worth statement was inadmissible is United States v. Guerrina, D.C.E.D.Pa.

Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

1953, 112 F.Supp. 126, which held that certain evidence sought to be used by the Government in a prosecution for income tax evasion should be suppressed. This evidence had been obtained voluntarily from the defendant by a Special Agent who at the time of the investigation "* * * had reason to believe that the defendant had been guilty of fraud and that his purpose in making the examination of his papers was to obtain evidence for contemplated criminal prosecution.", Id. at page 130, and who did not warn the defendant of his constitutional right to decline to produce these incriminating documents. However, upon reargument of the motion to supress, Judge Clary in United States v. Guerrina, D.C.E.D.Pa. 1955, 126 F.Supp. 609, admitted that his earlier opinion with respect to the evidence voluntarily produced by the defendant was erroneous and that such evidence was admissible, stating at page 610 "The import of the decisions in the Burdick and Montgomery cases * * is that failure to warn the defendants of their constitutional rights before questioning them as to their potential tax liability does not per se and as a matter of law render their admissions involuntary. The circumstances of the investigation and the failure to warn the defendants of their constitutional rights were matters which went only to the weight and credibility of the evidence thus obtained and not to its admissibility." We hold that the trial judge in the instant case did not err in denying the defendant's motion to suppress his net worth statement and that his denial was in accord with the weight of judicial opinion. United States v. Burdick, 3 Cir., 1954, 214 F.2d 768, vacated and remanded, 1955, 348 U.S. 905, 75 S.Ct. 311; Hanson v. United States, 8 Cir., 1950, 186 F.2d 61; United States v. Wolrich, D.C.S.D.N.Y.1954, 119 F.Supp. 538.

The defendant contends that his counsel should have been allowed to inspect a document referred to in the testimony of the Government's witness, Edward S. Samara, an accountant who had prepared the defendant's tax returns for 1947 and 1948. The particular document sought to be inspected by defendant's counsel was a report in the Government's possession signed by Samara and which he had re-examined in the United States Attorney's office before testifying. Samara stated that as far as he could recollect, his testimony on the witness stand was not different from that contained in the report. The defendant's contention that the trial court committed error in its refusal to order production of the document is based on United States v. Krulewitch, 2 Cir., 1944, 145 F.2d 76, 156 A.L.R. 337. In that case the principal Government witness had signed a written statement for an agent of the Federal Bureau of Investigation which completely exculpated the accused. The court said, 145 F.2d at page 78: "During the course of her cross-examination, the accused's counsel, who had apparently learned of this paper, demanded the privilege of inspecting it with a view to cross-examining her upon it, and presumably of putting it in evidence to impeach her." Apparently despite the trial court's refusal to allow accused's counsel to inspect the document, the principal Government witness upon cross-examination swore that the statement she had given the Government was false throughout. Thus, the competence of the document to contradict the testimony of this witness was clear and the defendant had properly laid a foundation for the inspection of this statement. The court appears to imply that inspection may be proper if the competence of the document to impeach the witness is apparent without inspection as otherwise the defendant could not ask those questions which are necessary for admission of the statement itself. In the Krulewitch case the defendant had already established that the Government's witness has made a prior contradictory statement. Once this was established the defendant had a right to inspect the statement. In the instant case, however, the defendant did not prove that Samara had signed a statement competent to contradict his oral testimony. In United States v. Rem-

ington, 2 Cir., 1951, 191 F.2d 246, certiorari denied 1952, 343 U.S. 907, 72 S. Ct. 580, 96 L.Ed. 1325, it is again implied that it is necessary that it first be established that the pre-trial statement is inconsistent with the witness' present testimony before such statement will be made available to the defense. In Gordon v. United States, 1953, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447, Justice Jackson clearly expresses certain principles to be followed by the trial court in determining whether the defense shall be given the right to inspect pre-trial statements made by Government witnesses. It is clear that the defense must lay a foundation before the court must order the production of documents. In the Gordon case this requirement had been met for it was expressly stated at page 418 of 344 U.S., at page 373 of 73 S.Ct. that "By proper cross-examination, defense counsel laid a foundation for his demand by showing that the documents were in existence, were in possession of the Government, were made by the Government's witness under examination, were contradictory of his present testimony, and that the contradiction was as to relevant, important and material matters which directly bore on the main issue being tried: the participation of the accused in the crime." In the instant case there is no evidence that Samara's pre-trial statement was inconsistent in any respect with his trial testimony and, therefore, there is no evidence that it contained contradictions on relevant, important and material matters bearing on the defendant's guilt or innocence.

The defendant maintains that he did everything possible to establish a foundation which would require the production of Samara's statement but that he could not show inconsistencies unless he had the document itself to compare with Samara's oral testimony. But if we hold that the trial court must require the production of such documents which the defendant alleges could be used not only to attack the credibility of the witness but also to establish the truth of the

facts included in the statement, if inconsistent with the witness' oral testimony, without any preliminary showing of competence to impeach, it is not at all unlikely that this would lead to frequent fruitless and time wasting "fishing expeditions" on the part of the defense. The defense is not without protection against the possibility of not being able to utilize pre-trial contradictory statements for if it is able to establish that the Government witness has given contradictory written statements on relevant matters to the Government as was done in the Krulewitch case, it has a right to inspect such statements.

■ The defendant further contends that the trial court committed reversible error when it allowed the Government to introduce an affidavit signed by the witness Tuttle, for the purpose not only of impeaching Tuttle but also for the purpose of showing the truth of the statements contained therein. The decision of the trial court if it allowed this affidavit as substantive evidence was erroneous. Bridges v. Wixon, 1945, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103. However, defendant's counsel did not state the ground of his objection and there is considerable authority holding that if a general objection, as was made here, is overruled, such general objection cannot avail the defendant upon appeal if that evidence was admissible for any purpose. Bucher v. Krause, 7 Cir., 1952, 200 F.2d 576, certiorari denied 1953, 345 U.S. 997, 73 S.Ct. 1141, 97 L.Ed. 1404, rehearing denied 346 U.S. 842, 74 S.Ct. 17, 98 L.Ed. 363; 1 Wigmore, Evidence, § 18 (3rd ed. 1940). Moreover, the trial judge was under the impression that Tuttle's affidavit was admitted "on the basis of his credibility" and not as affirmative evidence of the statements contained therein. We note that the defendant did not request instruction from the court on the purpose for which the jury could consider Tuttle's affidavit. It is doubtful that the failure of the trial court to make entirely clear that the affidavit was not to be utilized as substantive evidence was anything more

than a harmless error which did not affect the substantial rights of the defendant. Fed.R.Crim.P. 52(a), 18 U.S.C. The entire payment made to Tuttle by the defendant which was sought to be included as an expenditure in 1948 was $2,696.24, whereas the Government alleged that the defendant's unreported net income in 1948 was $23,466.22. If we decrease the latter amount by $2,-696.24 there would be left $20,769.98 in expenditures and increase in net worth in 1948, which the jury could find to be attributable to unreported 1948 income. See United States v. Costello, 2 Cir., 221 F.2d 668.

■ The defendant further contends that the Government's main witness, Roger Charpentier, a Special Agent with the Intelligence Division of the Bureau of Internal Revenue, was erroneously allowed to testify from summaries, which were introduced as evidence purporting to be copied from the records of the J. Scanlon and Company. This company was a crane operating enterprise which the Government sought to prove was wholly owned by the defendant. The Government maintains that the value of its assets was rightfully included in the defendant's net worth statement. Evidence was presented which tended to prove that these assets consisted of two cranes, a truck, a welding machine and tools and that these assets had been purchased by the defendant in 1947 and 1948. This enterprise was conducted as an individual proprietorship until March 7, 1949 when it was incorporated as J. Scanlon and Company, Incorporated. It appears that the records copied were the records of the corporate successor to the defendant's individual proprietorship. There was testimony to the effect that the only records kept for J. Scanlon and Company in 1947 and 1948 when it was owned by the defendant were a check book and pay roll record. Charpentier testified that his summary which purported to show the accounts receivable and accounts payable of J. Scanlon and Company on January 1, 1949 and also the existence of a tool asset item was copied from a "combination journal, ledger and cash receipt and cash disbursement record." Although the president of J. Scanlon and Company, Incorporated, brought all the records which he possessed relating to the company both in 1947 and 1948 when the company was owned by the defendant and in 1949 when the company was incorporated, Charpentier testified that these records did not include the journal entries from which he prepared his summaries. The essence of the defendant's challenge to the admissibility of Charpentier's summaries is that they were reconstructed from the books of a corporate successor of the defendant's individual proprietorship with which corporation the defendant had no connection and that therefore the corporate books or any summary of them were inadmissible hearsay. The Government's theory is that the corporate records were relevant and as they were not in the possession of J. Scanlon and Company, Inc., therefore they could logically only be in the possession of the defendant, who had denied the existence of such records, and under the authority of Lisansky v. United States, 4 Cir., 1929, 31 F.2d 846, 67 A.L.R. 67, certiorari denied 279 U.S. 873, 49 S.Ct. 514, 73 L.Ed. 1008, Charpentier's summaries as secondary evidence were then admissible. The Government established to the satisfaction of the trial judge that the original records were destroyed, mislaid or otherwise unavailable and that Charpentier's summaries were admissible as secondary evidence. We agree with the Government in this regard and assuming the original records were competent evidence, then under the circumstances the secondary evidence of these records was properly admissible. Whether or not the original records from which Charpentier copied his summaries were relevant to the issue of the defendant's income in 1948 is the primary question that must have been considered by the trial court in deciding whether the summaries were admissible. There is no doubt that the earliest date on which the particular entry as to these asset and liability items

could have been made was January 1, 1949. It could also be inferred by the jury that these entries were made in March, 1949 when the assets formerly owned by the defendant were acquired by J. Scanlon and Company, Inc. However, the jury could have found that the defendant very well could have had an interest in the corporation in 1949 when the assets and liabilities were entered in the corporate records, as Cowette, president of J. Scanlon and Company, Inc., testified that the defendant had not had any interest in the business since January, 1951 which would certainly not negative the probability that the defendant did have such an interest in 1949. Moreover, Charpentier testified that the defendant admitted that he had withdrawn from the business in 1951. The value given to assets and liabilities on January 1, 1949, including the tool asset item, by a corporation in which the defendant had an interest and which purchased the defendant's assets in March, 1949 does have some rational probative value as to the extent of the defendant's net worth on December 31, 1948. It was the function of the jury to determine how much weight it would give this evidence and the court did not err in admitting it for consideration by the jury.

■ Another point urged by the defendant is that this case must be reversed because of the insufficiency of proof relating to the defendant's wife's two banking accounts which were claimed by the Government to be wholly attributable to the defendant and thus includible in the Government's estimate of his net worth. It is argued that the defendant on March 2, 1953 told Charpentier, the Internal Revenue Special Agent, that $2,900 or $3,000 of the money in one of his wife's banking accounts had belonged to her father and this money had been returned to her father in 1950 or 1951. While under cross-examination Charpentier testified that he had not checked further on this item other than asking the defendant for further information which was not forthcoming. The Special Agent also testified that the defend-

ant had gone over every item in a later conference and that he had not objected to the apparent inclusion of his wife's bank accounts. However, the agent testified that he could have "easily found out" in what years the money had been deposited but had not done so because "It appeared at the time that the money in question related to later years * *." The defendant contends that this case should not have gone to the jury because the evidence relating to these bank accounts was insufficient to meet the standards laid down by the Supreme Court in Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127. In that case the Court said at pages 135, 136 of 348 U.S., at page 135 of 75 S.Ct.:

"* * * When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer— leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence. When the Government fails to show an investigation into the validity of such leads, the trial judge may consider them as true and the Government's case insufficient to go to the jury. This should aid in forestalling unjust prosecutions, and have the practical advantage of eliminating the dilemma, especially serious in this type of case, of the accused's being forced by the risk of an adverse verdict to come forward to substantiate leads which he had previously furnished the Government. It is a procedure entirely consistent with the position long espoused by the Government, that its duty is not to convict but to see that justice is done."

In view of the fact that a bank account of the defendant's wife increased

from $1,624.32 to $5,336.35 in 1948, which would indicate a deposit of over $3,000 in that year, thus supporting the defendant's explanation, the Government's failure to investigate this lead would require acquittal of the defendant if the Government's case turned upon the increase in net worth revealed in this bank account. However, the defendant's explanation would account for only $3,000 of a total alleged unreported net income in 1948 of $23,466.22. Thus, even if this lead were assumed to be true, the Government's evidence was sufficient to convict. See United States v. Costello, supra.

The defendant further contends that the Government's proof of the net worth of the defendant's investment in J. Scanlon and Company consisted of the value of the depreciable assets of J. Scanlon and Company only both in 1947 and 1948 and did not include the liabilities of that enterprise and therefore such net worth figure did not accurately reflect the true value of the defendant's investment. This contention would at first seem plausible for it is obvious that the value of one's investment in an enterprise is certainly affected by the extent of the liabilities of that enterprise. That is to say, if the defendant had purchased $50,000 worth of equipment and had contributed this to an enterprise solely owned by him and, assuming no other assets were purchased and that this enterprise had in some manner incurred a liability of $50,000, it would seem grossly illogical to say that the value of the defendant's enterprise was still $50,-000. The Government maintains, however, that as the defendant and J. Scanlon and Company were both on the so-called cash basis accounting, which does not recognize liabilities that have not resulted in the payment of cash by the taxpayer, to recognize such liabilities would produce a net worth figure that would not accurately reflect the defendant's income picture during the current year but would rather take into account in the current year a loss that would be taken advantage of insofar as taxes are concerned in the following year. Thus, in the example above, assuming the $50,-000 liability was an account payable which had been incurred in 1948 but was not paid until 1949, the defendant's income tax return for 1948, because he and his company were on a cash basis, would not reveal the existence of the $50,-000 account payable but his 1949 return would reflect the cash payment of $50,-000.

This court agrees that it is not improper to exclude from such net worth estimate such items as accounts receivable and accounts payable, which are not attributable to the defendant's current income (income being that income which is reportable by a taxpayer on a cash basis). However, if the Government does exclude all non-cash items such as accounts payable and accounts receivable it must not include in its net worth figure any assets which were purchased by means of accounts payable or any other non-cash liability account. For example, the value of a house purchased by means of a still outstanding loan could not be included in the net worth statement unless it was set off by the balance of the loan still owing. Similarly, if the defendant here had obtained certain materials for his crane business through accounts payable which were still unpaid at the end of the tax year in question, the value of such material could not appear in the closing net worth figure for that year unless offset by the balance of the accounts payable.

In the instant case the Government offered evidence from which the jury could infer that the principal assets of J. Scanlon and Company were purchased with cash and that this cash was obtained neither through accounts payable, loans outstanding or any other non-income source. For example, a bank official testified that the defendant had purchased a bank check for $19,335 which was apparently made up of a withdrawal of $1,335 from the defendant's bank account plus an unknown credit from another source; and this bank check was endorsed by a corpora-

tion from which the defendant purchased a crane for J. Scanlon and Company for $21,435. The Government also provided evidence tending to prove that the only outstanding loan to J. Scanlon and Company which it had been able to find was that of a local bank in the amount of $10,000, and this loan was reflected in the Government's estimate of the defendant's net worth. The Government also provided evidence that J. Scanlon and Company's accounts payable amounted to $4,030.08, as of January 1, 1949, which would indicate that no great prejudice could have been suffered by the defendant through the Government's failure to offset this $4,030.08 item, which it had discovered itself through investigation of the records of J. Scanlon and Company, against the value of a crane costing twenty-four thousand dollars purchased by the defendant in 1948 along with a truck and welding equipment. Moreover, there was no suggestion by the defendant that the purchase in 1948 of these assets was made possible through the establishment of an account payable of about only four thousand dollars. The record does not reveal any other lead given to the Government by the defendant which could possibly explain how these assets were obtained other than through cash attributable to current income and "* * * where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant." Holland v. United States, supra, 348 U.S. at page 138, 75 S.Ct. at page 137.

■ The defendant contends that the Government should have offered evidence from which it could be found that his income from his gambling activities exceeded his reported income before the allegedly prejudicial fact that he was a bookie was made known to the jury. This contention does not warrant lengthy discussion. In Holland v. United States, supra, 348 U.S. at pages 137, 138, 75 S. Ct. at page 136, it was said "Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient." Here it was shown that the defendant was a bookie and that he kept no records to show income from his bookmaking operations although the defendant had reported income from gambling operations. The Government also produced evidence tending to prove that the defendant was a bookie in order to make a large profit and not "for just a weeks pay." The proving by direct evidence of the extent of the defendant's income from bookmaking was not necessary in this case so long as the jury could reasonably find that it was a likely source from which the defendant's increases in net worth arose.

■ The defendant contends that Special Agent Charpentier's testimony was improperly admitted. Charpentier testified in direct examination that on February 24, 1953, he "showed Mr. Scanlon that according to the net worth statement prepared by Mr. Burnett, and also according to figures we were preparing, that it was obvious that there was unreported income." After objection by defendant that this was opinion evidence the trial court allowed the answer on the ground it was a statement made to the defendant and that as such it was not an inadmissible opinion of a witness on an issue to be decided by the jury. See 7 Wigmore, Evidence, § 1969(2), (3rd ed. 1940). We are of the opinion that the admission of this testimony was not an abuse of discretion on the part of the trial court.

■ The defendant's objection to Charpentier's statement that proper accounting on a cash basis would not consider accounts payable or receivable is without substantial merit as Charpentier was in this instance properly acting as an expert on income tax matters. United States v. Johnson, 1943, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546; United States v. Caserta, 3 Cir., 1952, 199 F.2d 905.

The admission in evidence near the close of the trial of two Government exhibits, one being a net worth statement and the other a tax computation was not an abuse of discretion by the trial judge as both were merely summaries of evidence that had been properly offered by the Government and could have been disbelieved by the jury in whole or in part. Defendant was free to present his own evidence and summaries if he wished to rebut this evidence. Hanson v. United States, supra.

Defendant's further contention that the trial court was guilty of improper conduct in that it demanded that the defendant produce certain documents does not warrant discussion especially when these alleged demands are viewed in the context of the entire record.

■ The defendant further contends that the Government did not provide sufficient evidence for the jury to infer with reasonable certainty that the Government's beginning net worth figure of $28,599.77 as of December 31, 1946 was an accurate representation of the defendant's actual net worth on that date. Defendant relies on Bryan v. United States, 5 Cir., 1949, 175 F.2d 223, affirmed 1950, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335, but the evidence presented in that case was certainly weaker than was presented by the Government in the instant case. In the Bryan case there was no admission by the defendant as to the extent of his beginning net worth. See Pollock v. United States, 5 Cir., 1953, 202 F.2d 281, 284, certiorari denied 345 U.S. 993, 73 S.Ct. 1133, 97 L.Ed. 1401. In the instant case there was properly admitted in evidence a net worth statement signed and sworn to by the defendant and prepared by the defendant's accountant which stated his beginning net worth was $26,262.22. It is to be noted that the net worth figure finally relied upon by the Government was $28,599.77 or $2,337.55 more than the defendant's own estimate of his net worth. Other admissions made by the defendant during the course of the investigation by Special Agent Charpentier

supply additional evidence from which the jury could infer that all of the defendant's assets as of December 31, 1946 were reflected in the Government's $28,599.77 net worth figure.

The defendant contends that certain portions of the Government's argument to the jury were so prejudicial as to entitle the defendant to acquittal. With regard to the interest of Bernard Cowette in J. Scanlon and Company and the Government's allegedly prejudicial remark with reference thereto, the Government counsel was merely presenting to the jury his conception of a reasonable deduction to be made from Cowette's testimony. See Keal Driveway Co. v. Car & General Ins. Corporation, 5 Cir., 1944, 145 F.2d 345. Defendant's contention that Government counsel failed to completely discuss the capital gains and losses provision of the Internal Revenue Code is without merit. The remarks concerning the source of defendant's income were withdrawn after objection and do not constitute prejudicial error.

■ The defendant also objected to that portion of the Government's counsel's argument to the jury which is as follows:

"I submit to you, ladies and gentlemen of the jury, that although, as Mr. Graf points out, the defendant does not have to take the stand, and a jury is not entitled to make any inference from that, if there were that information available, if in fact somebody had given Mr. Scanlon ten thousand dollars in 1946 or 1947 or 1948, they could have brought him in for you. But did you see any evidence of it? No."

The Government argues that this comment was allowable on two grounds. One ground appears to be that the defendant's counsel had already discussed the subject of the defendant not having to testify and that consequently the Government could be allowed to comment on the defendant's non-presentation of witnesses. The Government cites as authority for this point United States v.

# 392

Feinberg, 2 Cir., 1944, 140 F.2d 592, 154 A.L.R. 272, certiorari denied 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562, and Myres v. United States, 8 Cir., 1949, 174 F.2d 329 certiorari denied 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520, but these cases presented situations unlike that presented in the instant case and do not stand as authority for the Government's contention. In the instant case defendant's counsel did not attempt to indicate what the defendant would have said if he had testified and thus did not create an opportunity for the prosecution to comment upon the defendant's lack of evidence. The other ground of the propriety of Government's counsel's comment is that it is allowable to comment on the failure of the defendant to bring in a witness who could testify as to giving or loaning the defendant such sums of money as would justify the defendant's net worth increases. In Graves v. United States, 1893, 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021, the Supreme Court, although reversing a conviction because of prejudicial comment by the district attorney, stated at page 121 of 150 U.S., at page 41 of 14 S.Ct.: "The rule, even in criminal cases, is that, if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." This rule has been generally followed and consequently comments on the non-production of evidence which is peculiarly within the control of the other party have been allowed. 88 C.J.S., Trial, § 184; Chesapeake & O. Ry. Co. v. Richardson, 6 Cir., 1941, 116 F.2d 860, certiorari denied 313 U.S. 574, 61 S.Ct. 961, 85 L.Ed. 1531; Milton v. United States, 1940, 71 App.D.C. 394, 110 F.2d 556; See Bell v. United States, 4 Cir., 1951, 185 F.2d 302, 309, certiorari denied 340 U.S. 930, 71 S.Ct. 492, 95 L.Ed. 671. In the instant case the testimony of any person who had made a gift or loan to the defendant would certainly be evidence peculiarly within the control of the defendant and consequently the allowance of the prosecution's comment did not result in prejudicial error.

 The defendant's final contentions deal with the trial court's charge. This charge adequately instructs the jury as to placing on the Government the burden of proving the defendant's guilt beyond a reasonable doubt and also made clear to the jury that the fact of the defendant's indictment was not to be considered as evidence of guilt. Objection was made to the trial court's instruction that if the defendant's net worth statement was voluntarily given, the jury must consider its contents. This instruction, however, did not invade the province of the jury for only if the jury decided the statement was obtained voluntarily was it to consider the contents of that statement and the weight to be given to the contents was left entirely to the judgment of the jury.

The main objection of the defendant is to the trial court's instruction with regard to the defendant's net worth on December 31, 1946. It is contended that the trial court in effect made what amounted to a finding of fact on this issue when it stated: "The prosecution in this case has taken December 31, 1946, as a base or starting point and has determined the amount of the excess of his assets over his liabilities at that time. This constitutes his net worth as of that date." However, when this was objected to by the defendant the trial judge attempted to correct any misunderstanding on the part of the jury by further charging the jury on this point. In our opinion the jury should have understood from this amended instruction that it was their function to determine whether or not the defendant's net worth was substantially identical to the Government's figure.

The judgment of the district court is affirmed.