UNITED STATES of America ex rel. Esaw MITCHELL, #42060, Appellant,

v.

Warren PINTO, Superintendent, New Jersey State Prison Farm, Rahway, New Jersey.

No. 17359.

United States Court of Appeals, Third Circuit.

Submitted on Briefs Sept. 22, 1969.

Rehearing En Banc Oct. 13, 1970.

Decided Feb. 3, 1971.

Certiorari Denied May 3, 1971. See 91 S.Ct. 1622.

Adams, Circuit Judge, concurred and filed opinion in which Van Dusen, Circuit Judge, concurred.

Gerald McLaughlin, Circuit Judge, dissented and filed opinion.

Marilyn Mauskopf, Pepper, Hamilton & Scheetz, Philadelphia, Pa. (John G. Harkins, Jr., Philadelphia, Pa., on the brief), for appellant.

John P. Jehl, Assistant Prosecutor, Camden, N. J. (A. Donald Bigley, Camden County Prosecutor, Camden, N. J., on the brief), for appellee.

Submitted on briefs Sept. 22, 1969.

Before HASTIE, Chief Judge, and McLAUGHLIN and VAN DUSEN, Circuit Judges.

Rehearing en banc Oct. 13, 1970.

Before HASTIE, Chief Judge, and McLAUGHLIN, FREEDMAN, SEITZ, VAN DUSEN, ALDISERT, ADAMS and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

HASTIE, Chief Judge.

The district court denied relief to the appellant, a state prisoner serving a sentence under a New Jersey rape conviction, who sought a writ of habeas corpus on the ground that at his trial his failure to testify had been used against him in violation of his privilege against self-incrimination. Both the prosecutor and the trial judge had told the jury that the failure of the accused to testify might be used as evidence against him.

In 1965, the Supreme Court held that "the Fifth Amendment * * * forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Griffin v. California, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106. The Appellant's conviction occurred on June 15, 1964, but the case was still pending in the New Jersey courts on direct appeal in 1966. This chronology impels us to consider preliminarily whether the rule of the Griffin case applies to this case.

Tehan v. Shott, 1966, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453, holds that the Griffin rule does not control cases in which conviction had become final before the Griffin decision. But at the same time a situation indistinguishable from the present case was before the Court in O'Connor v. Ohio, 1965, 382 U.S. 286, 86 S.Ct. 445, 15 L.Ed.2d 337 and was remanded for reconsideration in the light of Griffin. Later, O'Connor's case was reviewed again, 1966, 385 U.S. 92, 87 S.Ct. 252, 17 L.Ed.2d 189, and the Court made explicit the reach of Griffin, saying:

"[I]t is clear the prospective application of that [Griffin] rule, announced in Tehan v. Shott, 382 U.S. 406 [86 S. Ct. 459, 15 L.Ed.2d 453], does not prevent petitioner from relying on Griffin, since his conviction was not final when the decision in Griffin was rendered. Indeed, in Tehan we cited our remand of petitioner's [O'Connor's]

case as evidence that *Griffin* applied to all convictions which had not become final on the date of the *Griffin* judgment. 382 U.S., at 409, n. 3, 86 S.Ct. [459], at 461." 385 U.S. at 93, 87 S. Ct. at 253.

To the same effect, in Johnson v. New Jersey, 1966, 384 U.S. 719, 732, 86 S.Ct. 1772, 16 L.Ed.2d 882, the Court said:

"Decisions prior to * * * *Tehan* had already established without discussion that * * * *Griffin* applied to cases still on direct appeal at the time [it was] announced. See * * * 382 U.S., at 409, n. 3, 86 S.Ct. [459], at 461."

Thus, the 1965 constitutional pronouncement in *Griffin* is applicable to Mitchell's conviction which did not become final until 1966.

Indeed, in the unreported decision of the New Jersey Superior Court, Appellate Division, sustaining Mitchell's conviction, the court recognized that the *Griffin* rule was applicable. *Accord*, State v. Lanzo, 1965, 44 N.J. 560, 210 A.2d 613. The conviction was sustained on the theory, to be discussed later in this opinion, that Mitchell had waived his privilege against self-incrimination.

We now consider whether the conduct of the judge and the prosecutor at appellant's trial was inconsistent with the *Griffin* rule. At that time the law of New Jersey permitted such comment and such a charge as the *Griffin* decision was soon to proscribe. Accordingly, in his argument to the jury defense counsel anticipated unfavorable comment by the prosecutor and in the judge's charge upon his client's failure to testify. He told the jury that it was on his advice that the accused had elected not to testify and argued that no unfavorable inference should be drawn from that circumstance. His anticipation was well founded, for in his summation the prosecutor told the jury: "you are entitled also under the law of this state to consider if you desire, that Esaw Mitchell's failure to take the stand was because he couldn't deny the incriminatory evidence proved against

him. * * * " Thereafter, the court charged the jury that " * * * by his silence the jury may infer that he [the accused] could not truthfully deny the charge." Thus, both the judge and the prosecutor did precisely what the *Griffin* decision holds they may not do without prejudicial violation of a fundamental constitutional privilege of the accused. However, the appellee attempts to avoid this conclusion by arguing that the conduct of the accused and his counsel during the course of the trial should be given effect as a waiver of his privilege against self-incrimination.

█ In Caminetti v. United States, 1917, 242 U.S. 470, 494–495, 37 S.Ct. 192, 61 L.Ed. 442, the Supreme Court held that when an accused takes the stand and testifies to refute part of the proof against him, his silence with regard to other damaging evidence as to matters within his knowledge is subject to adverse comment. In the present case, Mitchell neither testified nor called any witness. However, at the request of his counsel during cross-examination of a witness called by a co-defendant, Mitchell rose and stood before the jury next to the witness, who himself had previously been convicted as a participant in the crime of which defendant was now accused, to demonstrate a resemblance. The appellee characterizes this participation in a demonstration as a "testimonial act," equivalent to the defendant's verbal testimony in the *Caminetti* case. It is argued that this demonstration is like testimony in that it was intended to refute the state's evidence against the accused. But all relevant evidence introduced by the defense, whether demonstrative or verbal, is at least intended to refute the state's proof. This common purpose does not justify characterizing a physical demonstration as "testimonial." Moreover, technically Mitchell rested without offering any evidence whatever. The demonstration in question occurred during cross examination of a witness called by another party.

In applying the Self-Incrimination Clause of the Fifth Amendment, the Su-

preme Court has recognized a controlling distinction between real or physical evidence obtained from a defendant's person and that which is testimonial. The Court has upheld action by the state compelling an accused to submit to blood tests, Schmerber v. California, 1966, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908; to try on clothing, Holt v. United States, 1910, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021, and to exhibit his person for observation, United States v. Wade, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149. In addition, the Court has cited with approval cases holding that the privilege against self-incrimination "offers no protection against compulsion to submit to fingerprinting, photography, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." United States v. Wade, *supra*, at 223, 87 S.Ct. at 1930, quoting from Schmerber v. California, *supra*, 384 U.S. at 764, 86 S.Ct. at 1826. In the present case, the prosecution would clearly have had the right, if it so desired, to require Mitchell to rise from his seat and stand next to the witness then under cross-examination for comparison by the jury. The Self-Incrimination Clause would not have precluded such compulsion precisely because the evidence compelled was not testimonial or communicative. By the same token, voluntary participation by a defendant in such non-testimonial conduct cannot properly be analogized to such testifying as occurred in the *Caminetti* case.

In State v. Fioravanti, 1965, 46 N.J. 109, 215 A.2d 16, the Supreme Court of New Jersey reasoned that by engaging in a courtroom demonstration an accused implicitly asserts that such variable conditions as height, weight, and hair style have not changed since the date of the crime. But the jury may find the demonstration probative without any such assurance from the demonstrator. More-

over, if an accused, by merely engaging in a courtroom demonstration, is said to testify that his appearance has remained unchanged, then he is likewise forced to testify concerning the constancy of his appearance when he is compelled by the state to make such a demonstration. But such is not the case. *See Wade, Schmerber, Holt, supra.* The defendant does not testify in either situation. The constancy of his appearance is an inference which the jury may or may not draw from the introduction of the physical evidence itself and is as readily drawn when the presentation of this evidence is by the prosecution as when it is by the defense. In addition, this inference can be rebutted specifically by evidence of a change in the defendant's appearance or by argument during summation.[1] In no case should it be given effect as opening the door for a general instruction making the defendant's failure to testify evidence of guilt.

It must be recognized that the foregoing analysis and the conclusion to which it leads seem to contradict the rationale of this court's recent per curiam opinion in United States ex rel. Fioravanti v. Yeager, 1968, 404 F.2d 675. To the extent of such inconsistency, the reasoning of the *Fioravanti* opinion will not be followed.

The appellee makes a separate contention that the comments by the prosecutor and the charge of the trial judge were proper responses to defense counsel's own comments on Mitchell's failure to testify. We disagree.

In *Griffin*, the Supreme Court held that the silence of an accused in a criminal action "shall not create any presumption against him." Griffin v. California, *supra*, 380 U.S. at 613, 85 S.Ct. 1229, at 1232, quoting from Wilson v. United States, 1892, 149 U.S. 60, 66, 13 S.Ct. 765, 37 L.Ed. 650. The comments of Mitchell's counsel in his summation were intended to explain to the jury why

---

1. The prosecution in fact did stress that despite the similarity of appearance between Mitchell and the witness, the vic-

tim had positively identified Mitchell as one of her attackers.

Mitchell's failure to testify was not indicative of guilt and should be disregarded. As such, they were in accord with the basic principle enunciated in *Griffin* and were intended to serve the same salutary purposes as the present New Jersey rule that a defendant in a criminal action is entitled to an instruction that his silence be disregarded. State v. Smith, 1968, 100 N.J.Super. 420, 242 A.2d 49. A correct statement by defense counsel that no unfavorable inference should be drawn from the failure of the accused to testify does not open the door for responses which incorrectly and prejudicially characterize the defendant's silence as evidence of guilt.[2]

It merits mention at this point that the instant case does not present a situation where the prosecutor only incidentally alluded to defendant's failure to take the stand without characterizing it as evidence of guilt. Such an indirect, limited reference has at times been viewed as harmless, particularly if defense counsel has already brought the accused's silence to the attention of the jury.[3] In the present case, the prosecutor, rather than incidentally indicating that Mitchell had failed to take the stand, directly characterized Mitchell's silence as a circumstance that could properly be weighed as evidence of his guilt.

█ Similarly and even more clearly, the instruction of the trial court cannot be considered a permissible response to the comments of Mitchell's counsel. Research has not disclosed any case in which comments by defense counsel that the defendant's failure to take the stand should not be considered evidence of guilt have been held to open the door for an otherwise improper contrary instruction such as the *Griffin* case has outlawed.

Indeed, many of the cases allowing the prosecutor to respond to comments by defense counsel rely, at least in part, on the fact that the court gave a subsequent remedial instruction emphasizing that the defendant's silence must be disregarded. *See* United States ex rel. Miller v. Follette, United States v. Heithaus, Babb v. United States, and Baker v. United States, all cited Note 3, *supra*. In any event, "[w]hat the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another." Griffin v. California, *supra*, 380 U.S. at 614, 85 S.Ct. at 1233.

The present petitioner is entitled to relief by way of habeas corpus because the instruction by the trial court violated the Self-Incrimination Clause of the Fifth Amendment as authoritatively interpreted in the *Griffin* case. Perhaps somewhat less damaging, but also of constitutional proportions, was the error committed in permitting the prosecutor to characterize the defendant's silence as significant evidence of guilt.

The judgment of the district court will be reversed with direction that a writ of habeas corpus shall issue. But the state shall be privileged to retry the accused within a reasonable time and, pending such retrial, to follow the normal bond procedures applicable to such a defendant.

ADAMS, Circuit Judge (concurring).

I concur with that portion of the majority's opinion that holds Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) applicable to the charge of the trial judge permitting the jury to infer from the silence of the ac-

---

2. It has already been stated that, as a matter of trial tactics, defense counsel merely offered an anticipatory refutation of such comment as was prosecutors' wont under sanction of New Jersey law at the time of trial.

3. *See* United States v. Heithaus, 3d Cir. 1967, 377 F.2d 484; United States v.

Hephner, 7th Cir. 1969, 410 F.2d 930; United States ex rel. Miller v. Follette, 2nd Cir. 1968, 397 F.2d 363; Babb v. United States, 8th Cir. 1965, 351 F.2d 863; United States v. Stromberg, 2nd Cir. 1959, 268 F.2d 256; Scanlon v. United States, 1st Cir. 1955, 223 F.2d 382; Baker v. United States, 8th Cir. 1940, 115 F.2d 533.

cused "that he could not truthfully deny the charge."

The statements made by the prosecutor, however, present in part a different problem, and in my judgment require a more detailed recitation of the events at the trial. Mitchell's primary defense at his trial was that he left the scene before the victim was raped, and that the victim thereafter mistook a previously convicted participant, Raymond Forchion, for Mitchell. In his closing argument, Mitchell's counsel stated with respect to the identification of Mitchell:

"Here's something that I hope some of you may recall concerning this identification. When Miss Achey was asked if she had given a description of the man whom she now says was Esaw Mitchell to the police, and she said yes, and when she was asked what description of Esaw Mitchell she had given, her description was he was taller than the rest of them, he was darker than the rest of them, and he had a round face. Now, I hope that at least some of you ladies and gentlemen will recall that that distinctly was the description which Miss Achey said she gave to the police of the man whom in court she identified as Esaw Mitchell.

Now, when Raymond Forchion was produced by the defendant Robert Lewis, just before he left the stand you may recall also that I asked him to come down and stand beside Esaw Mitchell. I hope some of you recall that. Now, if there was any difference between the height of those two men, I wasn't able to see it. Of course, the Prosecutor asked Raymond Forchion if he had grown in height since the night of the attack, and he answered that he didn't know. Well, of course, I don't know either. I don't know whether Raymond Forchion has grown in height since the night of the attack. But, certainly, I say to you, ladies and gentlemen, that there visibly—there wasn't enough difference between the height of Raymond Forchion and the height of Esaw Mitchell for us to say that that

was significant or that Esaw Mitchell was taller, even than Raymond Forchion, and, of course, all of the co-defendants mentioned in the indictments weren't even here for comparison.

As to whether Esaw Mitchell was darker than any of the rest, we don't know that, either. All of the defendants aren't here. Looking at them now, there is some little difference. Of course, it is a little difficult. I guess in the three of us, the two defendants and me, there is some difference in color, of course, but, whether there is enough for that to be significant, for that to stand out, in the dark —in the dark—and everybody says it was very dark that night, no lights— how anybody could say, even between the three of us, let alone between the five men that are supposed to have been there, how Esaw Mitchell was so much darker than anybody else, that that is what fits the fact that that man that night and Esaw Mitchell, the defendant, today, are one and the same person, I submit to you isn't significant.

Whether he has a round face, that, of course, is a relative term, as you look at it, whether you call his face round. Now, of course, I have a round face. It seems to me if somebody was going to identify me, they would say, 'He's got a fat face.' I think we can all agree on that. But, whether Esaw Mitchell's face is a round one, I don't know, but that was the description that Miss Achey gave of Esaw Mitchell.

I ask you, from a description that he was darker than anybody else, that he was taller than anybody else, and that he had a round face, do you think such a description as that would permit any policeman, no matter how smart he was, to go and pick out a man?

Finally, on this matter of identification, you ladies and gentlemen for five days now have had an opportunity off and on, at least, to look even at these two defendants—not five, but two.

You have been sitting there, they have been sitting here. You have had an opportunity to look at them for almost five days, off and on, for five days, in the light. Now I am wondering if some time when we had come in the courtroom they had changed places, so that Esaw Mitchell was sitting at the end of the table and Robert Lewis was sitting next to me, I am wondering if you would even notice it, if there is so much difference even between their appearance that it would stand out, in the light, and I ask you, ladies and gentlemen, whether there is enough difference between even just the two, not five, that in the dark that a difference could be seen to the point of permitting a positive identification.

Now, ladies and gentlemen, that, I think, is really the crux of this case."

After comment on another matter, Mitchell's attorney, purported to explain why Mitchell did not testify:

"I am sure also that the Prosecutor is going to make a point of the fact that Esaw Mitchell didn't take the stand to testify in his own defense. I am sure he is going to say that, because any good Prosecutor would say that.

The decision for Esaw Mitchell not to take the stand was my decision, rightly or wrongly. If he took the stand, I believed he would be accused of lying. The Prosecutors almost always do accuse a defendant of lying in a criminal trial. So, I decided that, rather than have to divide my comment between whether or not Esaw Mitchell was lying and the loose ends or weaknesses in the State's case, I would rather just concentrate on the fact that the State has not proved this case against Esaw Mitchell beyond a reasonable doubt. That was my decision, and I think that if the other defendant, Robert Lewis, is accused of lying, that no doubt, perhaps, at least, my decision may be justified."

It was in response to these comments that the prosecutor spoke to the jury as follows:

"Referring now to the defendant, Esaw Mitchell, the Judge's comment concerning the quality of defense counsel was valid. Mr. Johnson is good. But, I want to point out something to you, and you just think a minute, and see whether or not you are judging Esaw Mitchell or whether you are judging Robert Johnson, because, if you are judging Robert Johnson, then you have seen goodness and you have seen a good, responsible human being.

Why do I say that?

Well, I say it because you don't know Esaw Mitchell. You heard nothing from Esaw Mitchell. You have never seen him on that stand, so that you have an opportunity to judge his demeanor and what he is; and, who has the right to say, who has the right to say that Esaw Mitchell knew that he was recognized when he ran, and who has the right to say that Esaw Mitchell knew that Raymond Forchion was recognized when Esaw ran? Robert Johnson? No. It has to be Esaw Mitchell, and there is your smoke screen."

*   *   *   *   *   *

"And what about the failure of Esaw Mitchell to take the stand?

Well, it's nice for his lawyer to come up and say, 'Well, this was my decision,' but, remember this, he is as smart as I am, and I think the purpose of it was exactly what I outlined to you, and that is that you wouldn't judge Esaw Mitchell, you would be judging what you heard from Robert Johnson, and there is the mark of an excellent advocate, but, I don't think he has fooled you. I don't think he has fooled you.

*You are entitled also under the law of this State to consider, if you so desire, that Esaw Mitchell's failure to take the stand was because he couldn't deny the incriminating evidence proved against him,* and, if I understand it, there is no evidence in Mitchell's defense, because I get the distinct impression that Forchion is

Lewis' witness, and this is the way he has been referred to."

Except for the italicized sentence, the prosecutor's remarks constituted a fair response to the arguments made by counsel. Had the trial judge not erroneously charged on the consequences of Mitchell's failure to testify, the italicized language by the prosecutor—uttered in the midst of an otherwise fair rebuttal—would present a difficult issue. First, these comments may not rise to the "constitutional proportions" found by the majority. But even if the quoted sentence did raise a constitutional problem, it might well be subject to the rule of harmless error under the doctrine enunciated in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); see also Harmless Constitutional Error: A Reappraisal, 83 Harv.L.Rev. 814 (1970). As the majority opinion ably demonstrates, however, the statements by the trial judge alone constitute a sufficient basis for reversal of Mitchell's conviction. Accordingly, we need not, and in my view should not, reach the issue whether the remarks by the prosecutor amount to reversible error.

Judge VAN DUSEN concurs in this opinion, but goes further in stating his view that the language of the prosecutor was not reversible error of constitutional proportions on this record.

GERALD McLAUGHLIN, Circuit Judge (dissenting).

On June 15, 1964, appellant was convicted by a Superior Court, Camden County jury of rape, kidnapping, atrocious assault and battery, and possession of a concealed weapon. His conviction was affirmed by the Appellate Division of the New Jersey Superior Court by opinion dated April 26, 1966; the New Jersey Supreme Court denied certification on November 15, 1966.

An outline of certain of the facts is essential to an understanding of the issue raised by appellant. Seven defendants were accused of attacking a young couple parked in an automobile in a relatively out-of-the-way location. The boy, allegedly, was beaten, and the girl dragged off to another vehicle, driven to a dark-secluded area, and raped three times. Five of the defendants were immediately arrested, and convicted. Appellant Mitchell and one other defendant (with whom we are not here concerned) were apprehended some months later, tried together and convicted subsequent to the conviction of the five.

At trial, although his co-defendant testified and called as a witness one of the previously convicted defendants (Raymond Forchion), appellant did not testify or call any witnesses. However, in cross-examining Forchion, appellant's attorney asked both Forchion and appellant to stand side-by-side before the jury to demonstrate their similar appearances. (Trial Tr. 151-152).

On summation, defendant's counsel contended that the victim was mistaken in identifying Mitchell as one of those who dragged her to the car of the defendants (Tr. 87) and raped her (Tr. 5); he argued that the scene of the rape was very dark, and that the victim, having been beaten and raped just prior to the alleged Mitchell rape, was greatly overwrought. Defense counsel suggested that the victim had mistaken Mitchell for one of the other defendants since Mitchell resembled the co-defendant being then tried with Mitchell (Tr. 268-269), and further, looked like Forchion (Tr. 266) with whom Mitchell had been compared, side-by-side, before the jury. (Tr. 152).[1] (Forchion testified that Mitchell had left the group prior to the rape).—Defense counsel also, in summing up, called the jury's attention to the fact that he, defense counsel, had decided not to call appellant Mitchell as a witness in order to in effect forestall an anticipated attack by the State on Mitchell's credibility.

1. Counsel for appellant at trial in addition argued that another co-defendant, a female convicted at the earlier trial, testified for the State that Mitchell was at the scene of rape only because she hoped to receive a pardon or other leniency.

The prosecutor, in summation, did comment on the failure of Mitchell to take the stand, and his failure to deny the charge. (Tr. 305, 306, 307, 312). The court, in charging the jury, used the then standard phrase that " * * * by his silence the jury may infer that he (Mitchell) could not truthfully deny the charge." (Tr. 349).

## I.

The rule of Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229 (1965), barring comment on a defendant's failure to take the stand, would govern our issue but for the exceptional trial circumstances. In those circumstances the comments of the State and trial court on appellant's failure to take the stand were justified. Although Mitchell was not sworn, his testimonial act of standing next to Forchion for comparison purposes was indisputedly intended to refute the State's evidence identifying Mitchell as one of the perpetrators of the crimes charged. Defense counsel reminded the jury in his summation that all of his questions to the rape victim " * * * were directed to whether or not she could actually identify Esaw Mitchell as one of her attackers. * * * " (Tr. 258). He argued at length the question of whether the victim correctly identified Mitchell (Tr. 258–269), and reminded the jury:

"Now, when, * * * Forchion was produced by the (co-)defendant * * *, just before he (Forchion) left the stand and you may recall also that I asked him to come down and stand beside Esaw Mitchell, I hope some of you recall that. Now, if there was any difference between the height of these two men, I wasn't able to see it. Of course, the Prosecutor asked * * * Forchion if he had grown in height since the night of the attack, and he answered that he didn't know * * * I don't know whether * * * Forchion has grown in height since the night of the attack. I don't know whether * * * Mitchell has grown in height * * * But, certainly, I say to you * * * that there visibly

* * * there wasn't enough difference between the height of * * * Forchion and the height of * * * Mitchell for us to say that was significant, or that * * * Mitchell was taller, even, than * * * Forchion, and, of course, all of the co-defendants mentioned in the indictments weren't even here for comparison." (Tr. 266–7).

Counsel continued to press the identification issue, and concluded: "Now, ladies and gentlemen, that, I think is really the crux of the case." (Tr. 269). From the foregoing, it is clear that the alleged faulty identification of Mitchell by the victim and the comparison of Mitchell and Forchion before the jury were without doubt the key defense strategy. By that testimonial act in demonstrating to the jury the similarities in appearance of Forchion and Mitchell to each other the latter was attempting to refute at least part of the State's identification evidence.

The situation is essentially comparable to the circumstances of United States ex rel. Fioravanti v. Yeager, 404 F.2d 675 (3 Cir. 1968), cert. denied 396 U.S. 860, 90 S.Ct. 131, 24 L.Ed.2d 112 (1969). There, the identity of the defendant was also strongly contested. Although Fioravanti did not take the stand, defense counsel—after getting a police officer to admit on the stand that defendant Fioravanti appeared to be the same size as he was at the time of his arrest—had Fioravanti retire to the jury room, and put on a pair of trousers which the police took from the alleged thief at the time of the arrest. (Those trousers had paint particles on them which were, according to the evidence, identical to the paint on the safe in question, and were marked in evidence). Fioravanti then returned to the courtroom, stood before the jury, removed his sweater, and as counsel summed up " * * * you could have put two Fioravantis in the waistband of the trousers when he stood before * * * (the jury) with the drooping drawers * * * " Fioravanti, supra, at 676.

Just as in the instant appeal, the question of the identity of the defendant was vitally important to the defense theory in Fioravanti. We held regarding the courtroom demonstration by defendant Fioravanti that:

> "The net result of the carefully planned action of appellant was substantial proof in his favor which at the same time eliminated the very real danger of * * * (the defendant) taking the witness stand and exposing himself to ruinous cross-examination." At 677.

Our ultimate conclusion in Fioravanti was that under the trial circumstances, comment on the failure of the defendant to deny or explain the State's evidence did not violate the Griffin rule. As Judge Weinstein recently said in United States ex rel. Miller v. Follette, 278 F. Supp. 1003 (E.D.N.Y.), aff'd, 397 F.2d 363 (2 Cir. 1968), cert. denied, 393 U.S. 1039, 89 S.Ct. 660, 21 L.Ed.2d 585 (1969):

> " * * * [T]he privilege against self-incrimination—important as it is—is not absolute. It must yield to some practical considerations and be subject to compromise where other important interests conflict.
>
> * * * * * *
>
> " * * * [W]ere (a) defendant allowed to give, what is for all practical purposes, testimony without being subject to some. check, the jury might be misled." At 1007.

While in the Miller trial defendant appeared pro se and used his position as advocate to orally testify directly to the jury, without taking the stand, the principle enunciated by Judge Weinstein completely applies to our situation. He correctly pointed out the need to balance, in each particular set of trial circumstances, the Fifth Amendment privilege against self-incrimination, and the State's rights when faced with a defendant's unsworn testimonial evidence or demonstration. In short, a defendant cannot and should not have it both ways. Hence the comments by the prosecutor and court, viewed in the context of appellant Mitchell's testimonial demonstration to the jury, were not improper.

## II.

Even more persuasive is the State's contention that after defense counsel commented in his summation on Mitchell's failure to take the stand, and tried to explain to the jury why he elected not to call Mitchell as a witness, the State had a right to refute the argument of defense counsel. The latter said:

> "I am sure also that the Prosecutor is going to make a point of the fact that Esaw Mitchell didn't take the stand to testify in his own defense. I am sure that he is going to say that, because any good prosecutor would say that.
>
> "The decision for Esaw Mitchell not to take the stand was my decision, rightly or wrongly. If he took the stand I believed he would be accused of lying. The Prosecutors almost always do accuse a defendant of lying in a criminal trial. So, I decided that, rather than have to divide my comment between whether or not Esaw Mitchell was lying and the loose ends and weaknesses in the State's case, I would rather just concentrate on the fact that the State has not proved this case against Esaw Mitchell beyond a reasonable doubt. That was my decision. * * * " (Tr. 273–4).

In response to defense counsel's statement, the Prosecutor answered this as follows:

> "And what about the failure of Esaw Mitchell to take the stand?
>
> "Well, it's nice for his lawyer to come up and say, 'Well, this was my decision,' as smart as I am, and I think the purpose of it was exactly what I outlined to you, and this is that you wouldn't judge Esaw Mitchell, you would be judging what you heard from * * * (defense counsel), and there is the mark of an excellent advocate, but, I don't think he has fooled you." (Tr. 306–7).

As Judge Learned Hand said long ago, when defense counsel in summation stated " * * * that the jury had heard all the testimony 'and the defendants, if they took the stand, could not add anything * * *'; * * * surely he surrendered any privilege they had not to testify. He could not in justice ask that the prosecutor must accept his version unchallenged." United States v. Feinberg, 140 F.2d 592, 595 (2 Cir.), cert. denied, 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562 (1944) [2]. The opinion in Baker v. United States, 115 F.2d 533 (8 Cir. 1940); cert. denied, 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128 (1941) sharply defines the same sound, fundamental principle at page 544 [3]:

"Counsel may make any argument which is based upon evidence or reasonable inferences therefrom and may reply to argument of opposing counsel, and in doing so may make statements which might otherwise be improper. * * * The Fifth Amendment and the statute, 28 U.S.C.A. § 632 (now, 18 U.S.C. § 3481), protect the defendant in a criminal prosecution in the right to remain off the witness stand, and prosecuting attorneys may not comment on the fact that the accused may have availed himself of that right * * *, but fair response to argument of counsel for the accused does not violate the Constitution nor the statute." (Citations omitted).

And finally, an analogous situation arose in Babb v. United States, 351 F.2d 863 (8 Cir. 1965). There defense counsel told the jury that the failure of the defendant to take the stand was counsel's decision, and if counsel made a mistake in not calling the defendant, the jury should blame counsel, but not hold it against the defendant. The Court in ruling on this proposition said:

"In explanation of this failure to testify, defense counsel implied that the defendant could satisfactorily explain his involvement but such was unnecessary in view of the infirmity of the government's case. Defense counsel concluded his comment by admonishing the jury not to condemn defendant but instead blame his attorney for the selection of a purely legal tactic. *The direct reference to defendant's failure to testify with the accompanying explanation was an invitation to the prosecutor to comment upon the subject and does not demand reversal.*" At 867–868. (Emphasis supplied).

Similarly in this action, the State, after defense counsel first broached the subject of defendant Mitchell's not taking the stand and attempting to explain why he did not call Mitchell as a witness, could, and did, properly reply thereto.

The theory for reversal here must, not only rely on the proposition that Griffin governs the trial situation before us but also nullify Fioravanti, an even stronger factual case in the same area as this appeal. The net result is to permit a totally vulnerable, concocted defense maneuver to avoid having the defendant sworn as a witness and thus subject himself to a proper and devastating cross-examination. In its stead, as was done in this trial and in Fioravanti, the defendant visually and orally through his attorney, projects his sole affirmative defense to the jury, untouched and, according to the court opinion, untouchable by the prosecutor. I venture to suggest that this is a giant step backward

---

2. In a federal prosecution, the prohibition against comment on a defendant's failure to waive his Fifth Amendment rights by taking the stand goes back to the Act of March 16, 1878, 20 Stat. 30, c. 37 (18 U.S.C. § 3481). Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650 (1893); Griffin v. California, 380 U.S. 609, 612, 85 S.Ct. 1229 (1965). And it pertains equally to comment on behalf of the prosecution and comment on behalf of the defense.

3. See also, Edwards v. Patterson, 249 F. Supp. 311, 314 (D.Col.1965).

in the administration of justice in the federal courts. I think it very clear that Mitchell's Fifth Amendment rights were not violated at his trial. I would affirm the judgment of the district court.