UNITED STATES of America

v.

Alan WEINBERG et al.

Crim. No. 71–267.

United States District Court,
E. D. Pennsylvania.

June 29, 1972.

☜673(1)

Joel Slomsky, Stephen Stein, Strike Force, U. S. Dept. of Justice, Philadelphia, Pa., for plaintiff.

Malcolm H. Waldron, Jr., Joseph A. Torregrossa, Harry S. Tischler, Defender Association of Philadelphia, Mitchell S. Lipschutz, Anthony J. Caiazzo, Jr., Donald C. Marino, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION AND ORDER

VANARTSDALEN, District Judge.

Defendants were charged under Title 18 U.S.C.A. § 371 (1966) (Conspiracy) with conspiring to violate Title 18 U.S.C.A. § 2315 (1970) (Receipt and Pledge of Stolen Securities—Interstate). The government contended that two certificates representing 3745 shares of Common Stock of Chrysler Motors were stolen from a brokerage firm's New York vaults, transported to Pennsylvania, where the defendants, knowing that the securities were stolen, attempted to pledge them with a Philadelphia bank for a large cash loan. Four of the six defendants were charged with the substantive violation of 18 U.S.C.A. § 2315 in addition to the conspiracy count.

Defendant Chilengarian [1] entered a plea of guilty to the conspiracy charge and testified as a government witness at the trial. At the conclusion of the gov-

---

1. For brevity and clarity, defendants' last names only will be used throughout this opinion.

ernment's case, all defendants moved for judgments of acquittal pursuant to Rule 29(a) of Federal Rules of Criminal Procedure. The motion was granted as to Grasso and denied as to all other defendants. The jury convicted the four remaining defendants; namely, Weinberg, Gornish, Kasparian and Blank on the conspiracy count. The defendants charged with the substantive offense of violation of 18 U.S.C. § 2315 were acquitted on that count.[2]

The testimony indicated that government agents were told by a "confidential informant" that Weinberg had access to One Million Dollars ($1,000,000) in stolen securities (3–52).[3] The confidential informant was identified as Charles Cardonick who was an acquaintance of some, if not all, of the defendants. The informer indicated that the stolen securities were believed to be United States Treasury notes. As a result, a special agent of the Secret Service of the United States Treasury Department was assigned to be in charge of the investigation. He posed in an undercover capacity as a bank loan officer for a Philadelphia bank, using the assumed name of John Campbell. The agent, with the aid of the informer, conducted a series of clandestine meetings separately with Weinberg, Chilengarian and Gornish. In the best "cloak and dagger" tradition, complicated arrangements were negotiated whereby the suspected stolen securities were to be turned over to the agent in his undercover capacity in return for a large cash loan.

The transaction culminated on December 14, 1970, when Chilengarian and the informer entered the bank and Chilengarian delivered to the agent the two certificates for 3745 shares of Chrysler Motors stock. Chilengarian was immediately arrested. Blank and Kasparian, who had brought Chilengarian and the informer to the bank and were waiting outside in a car for their return with the money, were likewise arrested. Grasso and Gornish, also waiting outside the bank in another car were arrested. Weinberg was arrested about one hour later at his Philadelphia office.

## MOTIONS FOR JUDGMENT OF ACQUITTAL

A careful review of the evidence indicates that there was sufficient evidence upon which the defendants could be found guilty of conspiracy. The motions for judgment of acquittal will be denied.

The evidence of the conspiracy consisted of testimony of the agent as to the various meetings he had with Weinberg, Gornish and Chilengarian; the testimony of Chilengarian that clearly and directly implicated Weinberg, Gornish and Blank and was sufficient to implicate Kasparian. Several items which tended circumstantially to corroborate the relationship between various defendants were seized from some of the defendants at the time of their arrests and received in evidence.

The following is a brief summary of the meetings held between the agent and the various defendants:

1. On November 24, 1970, the informer introduced the agent to Weinberg at the Walnut Grill in Philadelphia. The agent posed at that time and all subsequent times as a branch bank loan officer named John Campbell. The discussion concerned delivery of the securities in return for a large bank loan. Weinberg indicated that the securities would be treasury notes in $25,000 denominations—the serial numbers of which he would shortly supply. He further indicated that in a "package type deal" other types of securities might be included and that a deal might be able to be consummated in the near future for a large amount of securities. Weinberg stated that a "loan on a million dollars worth

---

2. Kasparian and Blank were charged only on the conspiracy count. All other defendants were charged on both the conspiracy count and the substantive count.

3. Numbers in parenthesis indicate the page reference to the Notes of Testimony.

of securities should be about $400,000". (3–34, 36).[4]

2. On December 1, 1970, at a mid-city restaurant, Weinberg and the agent again met and discussed the matter. The agent, who had not indicated in which bank he was employed, was questioned by Weinberg who expressed skepticism as to the agent's identity. Weinberg told the agent he knew the agent worked at The First Pennsylvania Bank & Trust Company because he, Weinberg, had already received a blank checking account card from that bank (3–124). Weinberg also asked how payment would be made to which the agent indicated that $50,000 would be paid in cash and $350,000 placed in a checking account where it could be easily withdrawn.

3. On December 3, 1970, Weinberg met the agent at The First Pennsylvania Bank & Trust Company, where Weinberg produced a list of securities, consisting mostly of corporate stock certificates—none of which were Chrysler Motors or government securities. When the agent questioned Weinberg as to the absence of government securities, Weinberg replied that it was only a partial list. Weinberg said that one of his "associates" would come to the bank to complete the preliminary paper work (3–124, 126).

4. Chilengarian came to the bank with the informer on December 8, 1970, where the informer introduced Chilengarian to the agent. Chilengarian, using the name Morris Abel,[5] told the agent he was prepared to complete the "loan application and fill out the checking account card to facilitate the loan." (3–127). Account cards under the name Penn Chevrolet Company were signed. Chilengarian said the securities were ready and that the transaction would probably occur the next day. The agent told him the funds would be available and could be taken from the bank on the delivery of the securities. (3–131).

5. On December 9, 1970, the informer introduced the agent to Gornish at a pre-arranged street corner, where they conversed in a parked car. Gornish said the securities were not then in Philadelphia but were en route. Gornish said the deal would take "a little while" and that "the stuff" was in New York. He told the agent to be patient. There was a discussion as to the amount of money to be paid and Gornish said there should be a larger amount of cash. The agent told Gornish that as soon as he obtained information as to "what was going to be coming", he could tell how much cash could be paid. Gornish then went into a nearby office building. He returned a few minutes later and said he had been unable to reach his "contact" by telephone. They then moved the car to another location where Gornish showed the agent the same list of securities that Weinberg had shown him. Gornish told the agent he had given the list to Weinberg and that he, Gornish, "was the top man" and he was "taking care of everything" and that the agent should "listen to him." (3–132 to 142).

6. Gornish telephoned the agent at the bank on three occasions on December 10, 1970, and assured him that the securities would be coming and that "the deal could go through". Gornish said the securities were still not in Philadelphia, but that a man named John, from South Philadelphia, was getting them. (3–145, 148).

7. On December 11, 1970, the agent met with Gornish and Weinberg and the informer in a car in Philadelphia. Gornish said that "the people from New York were very cautious", but that the securities would come from New York possibly on Sunday, December 13, 1970. Gornish also indicated that he was afraid

---

4. The inference was that such a "loan" would never be repaid.

5. Chilengarian used various names of Morris Abel and Michael Haig but there did not appear to be any sinister attempt to hide his true identity in regard to the transaction.

to hold the securities until the deal was ready to be concluded. An argument then ensued between Gornish and Weinberg as to when the securities would be coming and when the deal could be closed. Weinberg said that he had been "fooling around with the deal long enough and that the securities should be taken into their possession as soon as they arrived." (3–148, 151).

8. On December 14, 1970, Chilengarian came into the bank with the informer. The agent asked if he was ready to complete the transaction and he said he was. Chilengarian then handed the two stock certificates to the agent and immediately thereafter Chilengarian was arrested and the other arrests promptly followed.

In addition to the testimony of the agent, the defendant, Chilengarian, who had pleaded guilty, testified. Chilengarian said that Kasparian called him in early December and told him of the possibility of Chilengarian going into a new car agency through a contact of Kasparian's. The following day Chilengarian was introduced to Blank by Kasparian. A discussion took place as to going into business through money that would be obtained through a bank loan. Blank then took Chilengarian to meet the informer. The informer indicated he was familiar with a bank loan officer. It was also indicated that the person who would go into business with Chilengarian had "access to" certain securities of his grandfather which would be pledged for the loan. Chilengarian was informed that the securities were not owned by the person who would deliver them and that the owner had not given permission for their use but that the grandfather would approve the use when he found that the grandson was going to pledge them to secure funds for a legitimate business. Chilengarian and the informer then went to the bank in a car driven by Blank, where Chilengarian was introduced to the agent in the agent's undercover capacity and preliminary arrangements for

the "loan" were then made. Chilengarian signed a card to open the account under the name Penn Chevrolet. They then returned to Blank's car and Blank took Chilengarian home after first picking up Gornish in a center city office. Blank introduced Chilengarian to Gornish. Chilengarian was told he would be notified when the securities were available. A day or so later, Blank told him by telephone that things were not progressing as fast as anticipated and that the stocks were in Elizabeth, New Jersey. Chilengarian testified that some time later Kasparian telephoned and said that he had been asked to call Chilengarian to inform him that final arrangements could not be made until the following week. On a Monday, Blank said everything was ready. Blank picked Chilengarian up in a car. They went to the same office building where Chilengarian first saw Gornish, where Blank told Gornish that Chilengarian could not go to the bank until 12:30.[6] Chilengarian then left. When he returned, Gornish told him that everything was ready and that "they are waiting for you in the car". Blank was driving the car and the informer and Kasparian were passengers. Black pulled out the securities and handed them to the informer who passed them to Chilengarian who was sitting in the back seat with Kasparian. Kasparian looked at the securities with Chilengarian. Gornish had told Chilengarian that he, Gornish, would follow in another car and would see him at the bank. Grasso and Gornish followed the car that was driven by Blank. Blank told Chilengarian to make the transaction and immediately bring the money outside. (6–97). Blank told Chilengarian he was to get $10,000 in cash and $30,000 in a check.

When Blank was arrested while waiting outside in the car, a notebook with the name Mike Haig (Chilengarian's assumed name) and his telephone number was seized from him. Seized from Gornish at the time of his arrest outside of

---

6. Chilengarian was then being treated for heroin addiction by the methadone program and required a methadone treatment that morning.

the bank was a piece of paper with the name John Campbell written on it, an address book with the notation therein of "Pennsylvania Company—John Campbell"; and the names George Kasparian and Nathan Blank. Also seized from Gornish was the list of securities which at a previous time had been shown to the agent. These items were introduced into evidence. Items seized from Weinberg at the time of his arrest were suppressed on motion, and the checking account cards found in Gornish's possession at the time of his arrest were rejected when offered in evidence as having insufficient probative value.

The prosecution also presented evidence concerning the inventory controls and audit of the brokerage firm which was sufficient for the jury to find that the two stock certificates representing 3745 shares of Chrysler Motors Common disappeared from its New York office vaults during 1970 under such circumstances that the loss could be accounted for only by a theft or an unlawful conversion or taking as required under 18 U.S.C.A. § 2315. The adequacy of this testimony will later be fully discussed.

From the agent's testimony alone, there was ample evidence of a conspiracy among Weinberg, Gornish and Chilengarian to obtain and sell or pledge securities known to have been stolen and known to have been traveling in interstate commerce.

The only evidence regarding Grasso was that he was in the car with Gornish at the time Gornish was arrested outside of the bank immediately after the securities were delivered and that Grasso had travelled in the car with Gornish. There was no evidence that Grasso said or did anything, or that he was present during any of the several prior meetings. Although his presence in the car might give rise to reasonable suspicion, it clearly was insufficient to justify a conviction, and consequently the motion for judgment of acquittal at the close of the

government's case was mandatory and was granted as to Grasso.[7]

Concerning Kasparian and Blank, the question of the sufficiency of the evidence is much closer. Both men travelled to the bank with Chilengarian when the stock certificates were produced by Blank. Kasparian originally contacted Chilengarian about the possibility of Chilengarian's "going into a new car agency" through a contact of Kasparian's. Kasparian introduced Chilengarian to the informer. Kasparian telephoned to Chilengarian on a later occasion to tell Chilengarian that he had been asked to advise him that the final arrangements could not be made until the next week. Kasparian was present during the final drive to the bank and was present when the securities were transferred by Blank to Chilengarian and he looked at them. Although it was apparent from the testimony of Chilengarian that he was making a special effort to exculpate Kasparian from any responsibility, the numerous contacts that Kasparian had in the transaction which furthered the conspiracy and the actual transfer of the securities were such that a jury could reasonably find from all the surrounding circumstances that Kasparian was an active participant and an integral part of the conspiracy beyond a reasonable doubt.

There was even more evidence tying Blank to the conspiracy. Blank acted as the chauffeur in many of the transactions. He drove when Chilengarian and the informer first went to the bank. (6–64). Not only was he the chauffeur but he was in possession of the securities on December 14, 1970, when the pledge was actually attempted. In addition to other phone calls by Blank to Chilengarian, during one call he indicated that the stock certificates were then in Elizabeth, New Jersey, and that things were not progressing as fast as anticipated. It was Blank who told Chilengarian that everything was ready and arranged for

---

7. Although Grasso's first name was John, there was nothing to show that he was the "John from South Philadelphia" who was to pick up the securities in New Jersey.

Chilengarian to meet with him to go to the bank for the final transaction. This evidence was sufficient under all of the circumstances to justify the jury's finding that Blank was an active participant in the conspiracy.

The motions for judgment of acquittal are, therefore, denied.

## ADEQUACY OF PROOF THAT SECURITIES WERE STOLEN, INVOLVED INTERSTATE COMMERCE, AND WERE OF THE JURISDICTIONAL VALUE

The government sought to prove that the two stock certificates had been "stolen, unlawfully converted or taken" from the New York vaults of Walston and Company (Walston), a brokerage firm, through the testimony of certain witnesses and exhibits as follows:

Exhibits G–1 and G–2 were the Chrysler Motors certificates issued in the name of Walston and endorsed by a stamped endorsement in blank by Walston. Although defense counsel throughout the trial and in argument referred to these certificates as being in bearer form, they were technically endorsed in blank, although they could be transferred by mere delivery the same as a bearer certificate. See Uniform Commercial Code-Investment Securities, Pa.Stat. Tit. 12A, § 8–101 et seq. (1970) and especially § 8–308; 3 Anderson, Uniform Commercial Code, § 8–308:9, p. 749, § 8–310:3, p. 753 (1971).[8]

Exhibits G–3 and G–4 were transfer slips of Walston, testified to by James Dennean, who was the Vice President and cashier of Walston, as being made concurrently with the events and kept as regular business records. These exhibits indicated that one of the two stock certificates was deposited in the New York vaults of Walston on June 2, 1970, and the other on August 17, 1970. (4–15). Mr. Dennean also testified that there were no records indicating that the certificates had ever been removed from the vaults after being so deposited although regular business records of such removal were kept and would have been available if in fact the certificates had ever been lawfully removed.

Edward McIlligot, Walston's chief of security, testified in detail as to the careful guard that is kept over the securities held in its vaults. Nicholas Rosa, an audit clerk of Walston, testified as to the extensive search that he made to locate the two stock certificates between September 28, 1970, and October 5, 1970, after the certificates appeared to be missing following an audit by the independent auditing firm of Arthur Anderson & Company in September of 1970.

The cumulative effect of this testimony, if accepted by the jury, was that the two specific stock certificates which were turned over by Chilengarian to the agent on December 14, 1970, in Philadelphia, Pennsylvania, had been issued in the name of Walston, had never been transferred from Walston although they were endorsed in blank by Walston, had been held in the possession of Walston in its New York vaults, from which vaults they disappeared sometime after their respective deposit dates and prior to October 5, 1970; and that such disappearance could only have been caused by a theft or embezzlement, as opposed to accident or negligence.

Defendants contend that it was error to permit Mr. Rosa to testify that the records of Walston failed to disclose any record of a lawful removal of the stock certificates without producing all of Walston's records as the best evidence. Mr. Rosa testified in detail as to a search of the records and that all the records were negative in indicating any removal of the certificates by normal business procedures. By so doing, he presented all of the evidence available. The testimony indicated clearly that the records examined by Mr. Rosa were voluminous, detailed, and of little significance to anyone not skilled in the records keeping

8. The Uniform Commercial Code has been adopted in New York, New Jersey and Pennsylvania as well as most of the other states.

techniques of Walston. Production into evidence of all of the records of Walston to prove a negative fact would have been of no practical benefit to the jury or the defense.

The defense was given a full opportunity to cross-examine Mr. Rosa as to Walston's record-keeping techniques and accuracy, and as to the correctness and thoroughness of Mr. Rosa's search. Although his expertise was attacked, the question of the accuracy of the search and its reliability were proper questions for the jury. There was adequate evidence upon which the jury could conclude that the certificates were either stolen, unlawfully converted or unlawfully taken from the possession of Walston.

The documents and records examined by Mr. Rosa included practically all of Walston's records from the spring through the fall of 1970. These records were from a practical standpoint irremovable and unavailable without great inconvenience. Therefore, it was not essential that they be produced. 4 Wigmore on Evidence, § 1192(i) (3rd Ed. 1940). Wigmore states that "testimony, by one who has examind the records, that *no record* of a specific tenor is there contained is receivable instead of producing the entire mass [of documents] for perusal in the court-room." 4 Wigmore on Evidence, § 1231, p. 441 (3rd Ed. 1940). Randall v. United States, 148 F.2d 234 (5th Cir. 1945); See Yoffe v. United States, 153 F.2d 570, 575 (1st Cir. 1946); Bowen v. United States, 153 F.2d 747, 750 (8th Cir. 1946). See 4 Wigmore on Evidence, § 1244(5) (3rd Ed. 1940); *cf.* Rule 27, Federal Rules of Criminal Procedure (1971) (official records) which fully incorporates Rule 44 of the Federal Rules of Civil Procedure (1970); T'kach v. United States, 242 F.2d 937 (5th Cir. 1957) (official records).

In Nichols v. United States, 48 F.2d 46, 49 (5th Cir. 1931), a postmaster and others were permitted to testify that a person claimed to be fictitious did not have such a name in the post office's address records or in the directories and telephone books of the community. The witnesses were also allowed to testify that they had never known a person of that name in the vicinity. This evidence was permitted to prove the negative fact of the non-existence of the person in that community.

█ Defendants contend that assuming the testimony of Mr. Rosa was admissible, at best the evidence would establish only a mysterious disappearance as opposed to a theft or unlawful conversion or taking. In United States v. Marcus, 429 F.2d 654 (3rd Cir. 1970), the court held that direct evidence of the theft of the securities was not required, where shortly after the disappearance the securities were located in the possession of the defendant in another state. Such evidence sustained both the finding of a theft, and that interstate commerce was involved. Although in that case there was testimony by a witness that he had actually seen the securities in possession of the brokerage house and testimony by an expert that the securities could not have been negligently misplaced, the evidence in this case is sufficient to likewise establish both that the securities were stolen and that they were transported through interstate commerce.

Title 18 U.S.C.A. § 2315 requires that the value of the securities be $5,000 or more if the conduct was receiving, concealing, storing, bartering, selling or disposing of stolen securities, and if the conduct was pledging or accepting the security as security for a loan, the securities must have a value of $500.00. Regardless of whether the applicable value in this case was $500.00 or $5,000.00, the securities involved in the present case clearly exceeded the value of $5,000.00. A stipulation was entered into between the government and defense counsel showing that New York stock exchange quotations for Chrysler Motors common stock during the entire calendar year of 1970 would show a low quotation of 16⅛ per share to a high quotation of 35¾ per share (8–148–149), so that the total low value for the number of shares involved would be in excess of $60,000.00.

The defendant's contention is that Walston & Company, upon ascertaining that the securities were missing, placed a "stop" on the securities prior to December 14, 1970 and that, therefore, the securities were no longer of any value. This contention is without merit. The value of the securities may be determined by the market value at the time and place of the theft. United States v. Tippett, 353 F.2d 335, 337 (4th Cir. 1965), cert. denied, 383 U.S. 908, 86 S.Ct. 889, 15 L.Ed.2d 664 (1966), cited in United States v Nall, 437 F.2d 1177, 1187, n. 8 (5th Cir. 1971); United States v. Riso, 405 F.2d 134, 137 (7th Cir. 1968). Since the stop order was not placed on the securities until after Walston & Company found the securities to be missing, regardless of the effect of the stop order, the securities were of a value in excess of $5,000 at the time of the theft.

The "stop" order would not make the securities worthless since under the negotiable instruments law of Pennsylvania, established through the adoption of the Uniform Commercial Code, a stop order does not prohibit the securities from having full face value in the hands of a bona fide purchaser for value. The securities were endorsed in blank and could be freely transferred by delivery and could pass to a bona fide purchaser. Pa.Stat. Tit. 12A, § 8–301 (1970); Young v. Kaye, 443 Pa. 335, 345–46, 279 A.2d 759 (1971). A bona fide purchaser for value of stolen securities endorsed in blank has the right to have the securities registered in his name when presented to the issuer. See Article VIII, § 405 (3) of the Uniform Commercial Code, Pa.Stat. Tit. 12A, § 8–405(3). Therefore, even after the stop order was entered, the securities would have had a value in excess of $60,000.00. Consequently, the jurisdictional value of the securities was clearly established. In addition the matter was left to the jury as to whether the jurisdictional amount had been reached and the court specifically

permitted the jury to consider the effect of the "stop" order, if any, in reducing the value of the certificates (12–40). This charge was undoubtedly far more favorable to the defendants than that to which they were entitled.

## KNOWLEDGE THAT THE SECURITIES WERE STOLEN

Defendants contend that the evidence was not sufficient to permit the jury to find guilty knowledge on the part of the defendants that the securities were stolen and that the jury could not infer guilty knowledge "from the unexplained possession of recently stolen property," because of the length of time intervening between the disappearance of the securities and the attempt to pledge the securities. It is clear that unexplained possession of recently stolen property will permit the jury to infer the guilty knowledge. United States v. Kibler, 457 F.2d 95, p. 99 (decided March 13, 1972 (3rd Cir.), citing United States v. Allegrucci, 299 F.2d 811 (3rd Cir. 1962); Hale v. United States, 410 F.2d 147 (5th Cir. 1969), cert. denied, 396 U.S. 902, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969).

The evidence reveals that one of the two certificates disappeared from Walston's vault sometime after June 2, 1970.[9] The other certificate was last identified as being in Walston's possession on August 17, 1970. The final search and audit by Mr. Rosa was completed on October 5, 1970. The exact date of the theft is not known. The certificates were found in the possession of the defendants on December 14, 1970. The one certificate could possibly have been stolen as long as six and a half months prior to the date they came into Chilengarian's possession. Under all of the circumstances of the case, determination of guilty knowledge was a proper matter for the jury to determine. See Lee v. United States, 363 F.2d 469 (8th Cir. 1966) (a five months' period). The court expressly advised the jury that the

9. There was some testimony that one of the records indicated that the certificate was still in Walston's possession at least as late as July 7, 1970.

inference of guilty knowledge from mere possession could be drawn only if it found the securities to have been stolen as opposed to the possible unlawful conversion or unlawful taking (12–45, 48 and 12–79). In addition there was extensive direct testimony by Chilengarian of the guilty knowledge of himself and other of the defendants, and considerable circumstantial evidence of guilty knowledge of all defendants.[10]

## AGENTS PROPERLY USED REPORTS TO REFRESH RECOLLECTION

■ The agent who had made notes contemporaneously with or shortly after the events as to the various meetings was permitted to examine his notes repeatedly before testifying as to the precise meetings and details of the meetings with certain of the defendants. The agent testified that he would have to examine his report to refresh his recollection of the details of the events. Permitting this to be done was clearly within the trial court's discretion and I was satisfied from all of the testimony presented by the agent that he was refreshing his recollection for the purpose of being entirely accurate in the details of his testimony. McCormack, Law of Evidence, § 9 (1954); 3 Wigmore on Evidence, § 758 (1970); Esperti v. United States, 406 F.2d 148, 150 (5th Cir. 1969), cert. denied, 395 U.S. 938, 89 S.Ct. 2005, 23 L.Ed.2d 454 (1969), cited in United States v. Jenkins, 442 F.2d 429, 438 (5th Cir. 1971). It was obvious to the jury that the witness was frequently referring to his notes and it was within its province to evaluate the accuracy of the testimony given by the agent.

## FAILURE TO PRODUCE THE GOVERNMENT INFORMER

■ Defendants contend that the failure of the government to call the informer, Charles Cardonick, was a "fatal flaw," requiring a judgment of acquittal. It is clear that Charles Cardonick was present at most of the meetings that took place between the agent and the various defendants. The government, however, is not required to call all witnesses who are competent to testify and this applies to special agents and informers who participate in the transaction. United States v. Peterson, 424 F.2d 1357, 1363 (7th Cir. 1970); Velarde-Villarreal v. United States, 354 F.2d 9, 12 (9th Cir. 1965); Washington v. United States, 275 F.2d 687, 690 (5th Cir. 1960). There is no allegation by defendants nor any indication that the government was concealing any evidence which would tend to exculpate any of the defendants as was condemned in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The jury was instructed that where a witness who was particularly available to and might have been called by the government was not called, the jury might infer that the witness would testify unfavorably to the government. United States v. Jackson, 257 F.2d 41, 43 (3rd Cir. 1958), citing Graves v. United States, 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893). The charge specifically mentioned that Cardonick was not called as a witness. (12–16).

Counsel for Blank complains that his pretrial discovery motion to determine the name of the informer was improperly denied. His counsel was appointed approximately five and a half weeks before the trial date. Ten days before the date fixed for trial a motion for pretrial discovery including the names and addresses of all informers was filed on behalf of Blank. Prior to Blank's counsel being appointed, other defendants had filed similar pretrial discovery motions but upon government counsel making available to all defendants, including Blank, a copy of the agent's entire investigation report which included information concerning the informer, those motions were withdrawn. Blank's motion for discovery was refused just prior to the start of the trial.

---

10. Defendants were convicted not of the substantive offense but of conspiracy.

The identity of an informer need not always be revealed by the government prior to the trial. Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). See McCray v. Illinois, 386 U.S. 300, 311, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); United States v. Skeens, 449 F.2d 1066, 1069–70 (D.C. Cir. 1971); United States v. Kelly, 449 F.2d 329 (9th Cir. 1971). In *Rugendorf* the Supreme Court distinguished Roviaro v. United States, 353 U.S. 53, 77 S. Ct. 623, 1 L.Ed.2d 639 (1957), where "the informant had played a direct and prominent part, as the *sole* participant with the accused, in the very offense for which the latter was convicted." *Id.* at 534, 84 S.Ct. at 829. (Emphasis added). In the present case the informer's testimony was not essential and there was no showing that the defendants were unable to obtain the informer as a witness or that they were in any way prejudiced by not earlier ascertaining his identity. It is clear, however, that Blank knew the informer's identity at the time of trial. The original pretrial motion (later withdrawn), filed on behalf of Alan Weinberg, specifically asked for any statements of Charles Cardonick. Before commencement of the selection of the jury, counsel for Kasparian stated that he knew that Cardonick was involved but that he understood the government would not call Cardonick as a witness. This was confirmed by government counsel. (1–11). It was then also indicated that Cardonick might be called by counsel for one of the defendants. On the first day of the taking of the testimony, Cardonick was revealed directly in the testimony as an informer who played an active role in the transactions. If he was not known prior to that time by Blank or his attorney, he was at least revealed as of the first day of taking of testimony and any additional question as to his identity or whereabouts could have been obtained at that time by cross-examination. The trial continued for seven more trial days

prior to counsel commencing closing addresses. No further request was made on behalf of any counsel that Cardonick's identity or whereabouts be further revealed or that he be produced as a witness. There was no showing that Blank was in any way prejudiced by not having the information earlier, if indeed he did not know prior to the first day of trial that the informer was Charles Cardonick.[11]

The government should not construe my refusal to require that the informer's name in this case be disclosed to the defendant Blank as being precedent that it may with impunity refuse in every situation to make such disclosures. Unless there is some valid reason (such as a reasonable fear of physical harm to the informer or his family), the policy should be one of free disclosure by the government.

## COURT'S CHARGE ON DEFENDANT'S FAILURE TO TESTIFY

At the trial of the case, neither Gornish nor Kasparian testified. Blank and Weinberg did testify. Gornish requested the court to charge as follows:

"The law does not require a defendant in a criminal case to take the stand and testify, and no presumption of guilt may be raised, and no inference of any kind may be drawn, from the failure of one or more defendants to testify."

During the voir dire of the jury panel in the selection of the jury, the trial judge said to the panel:

"I think I told you previously that, as in all criminal cases, a defendant, and this applies to all defendants here, is presumed to be innocent and that presumption remains with him throughout the trial of the case until and unless the government convinces you beyond a reasonable doubt by proper and credible evidence that the defendant or defendants are guilty. Do any of

11. It was apparent that all counsel and defendants were conferring frequently among themselves, and that all of the defendants knew both the identity and the address of Charles Cardonick.

you feel that you would not be able to in good conscience apply that presumption of innocence and to acquit a defendant if you had a reasonable doubt as to his guilt?"

(No response).

The court then stated to the panel:

"Also, of course, I am sure that you are all familiar with this, and it is for two rather obvious reasons, that a defendant is not required to do anything in a criminal case, and no inference whatsoever can be drawn against him if he does nothing. This is because, first, the government has the responsibility and the duty to prove a defendant guilty beyond a reasonable doubt and, secondly, of course, as I am sure all of you know, there is a constitutional right of a person not to incriminate himself, and this includes the right not to testify in a criminal proceeding, and the mere fact that a person does not testify cannot be considered against that person whatsoever or in any way. And this will be true where there may be several defendants tried together. If one should testify and not others, you should not consider in any way the facts that certain of the defendants would not testify or did not testify."

None of the five defense counsel present made any objection to that statement to the jury panel. This instruction was in substance repeated when two additional prospective jurors were brought from the jury room to join the panel, and again no objection was voiced.

The instruction that was given to the trial jury in the court's charge was as follows:

"I have indicated to you that the law never imposes any burden on the accused and the accused need do nothing and need prove nothing, and I would specifically call attention to the jury that the law does not compel a defendant in a criminal case to take the witness stand and testify. Every person has a constitutional right not to be a witness against himself and not

to testify against himself, and no inference and no presumption of guilt may be raised of any kind from the failure of any person accused of crime from testifying." (12–18).

At the close of the charge, the defendant Gornish complained that it was error to advise the jury of the constitutional right not to testify as giving some sort of inference of possible guilt. The court made a final statement to the jury thereafter as follows:

"I also mentioned I think, because it is obvious that certain of the defendants did not take the witness stand, that they had a constitutional right not to testify, and perhaps in doing that I inadvertently may have created in your minds a misunderstanding as to one of the reasons why it is so that one need not take the witness stand and that is that, as I pointed out repeatedly, the burden of proof is always on the government throughout the case to prove the case beyond a reasonable doubt and in all elements of the case. Consequently the defendants are never required to produce any evidence or to prove anything." (12–73, 74).

■■■■■ Counsel have cited no cases holding that it is error to advise a jury that a person has a constitutional right not to testify. The case of United States ex rel. Mitchell v. Pinto, 438 F.2d 814 (3rd Cir. 1971), cert. denied, 402 U.S. 961, 91 S.Ct. 1622, 29 L.Ed.2d 124 (1971), relied on by counsel for Gornish, found that "[b]oth the prosecutor and the trial judge had told the jury that the failure of the accused to testify might be used as evidence against him." Id. at 815. This is almost precisely the opposite of the instruction given in the present case that no inference or presumption of guilt could be raised from failure of the person accused to testify. There should be no error in a trial judge telling a jury that a person has a constitutionally protected right that he need not testify against himself. In addition, if the defendants thought this instruction erroneous, they should have objected when

the instruction was originally given to the jury panel prior to the jury being sworn.

## MOTIONS TO SUPPRESS

All of the defendants with the exception of Kasparian filed pretrial motions to suppress evidence seized at the time of their arrest. The suppression hearing was held during the course of the trial. The trial had been delayed several times. It was previously set for October but Blank still had failed to obtain counsel although repeatedly indicating he would obtain private counsel, and Kasparian's counsel was ill. In order to assure the presence of the five defendants and their five separate attorneys, trial was specially listed for November 29, 1971. The most practical time to hold the suppression hearing was either immediately before or during the course of the trial. It was unknown at the outset of the trial whether the government would seek to present all or any of the evidence seized from the persons of the defendants. Consequently, the hearing was held in the absence of the jury during the course of the trial and no evidence that was subsequently suppressed was brought to the attention of the jury.

Rule 41(e) of the Federal Rules of Criminal Procedure (1971), provides that the trial judge may in his discretion hold hearing on a motion to suppress at the time of the trial. While the United States Supreme Court indicated preference for holding suppression hearings prior to trial in Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), the court emphasized that the time for holding such hearings would normally lie within the discretion of the trial judge. Id. at 342, 60 S.Ct. 266. Because of the defendants' rights for a speedy trial and the lengthy delays that had previously taken place, I concluded that the most appropriate and expeditious time to hold the suppression hearing would be at the time of the trial, if and when it became apparent the government would seek to introduce or refer to any seized property.

█ Defendants further contend that since the trial judge sitting in the suppression hearing had already heard certain of the trial testimony, it constituted error to consider such trial testimony. In effect, defendants are contending that the suppression hearing should have repeated all of the testimony theretofore presented in the trial before the court could consider it in the suppression hearing. I do not consider this to be an expeditious or reasonable use of court time and in the absence of any controlling case law to the contrary, fail to find this in any way prejudicial to the defendants, as they had a full opportunity to introduce any relevant evidence at the suppression hearing and to cross-examine any witnesses that had been heard up to that point in the trial.

█ Defendants contend that the warrantless arrests were invalid because there was no probable cause and there was adequate time within which to obtain warrants. The summary of the testimony heretofore contained in this opinion shows clearly that there was probable cause to believe a conspiracy existed as to all defendants with the possible exception of Grasso. No evidence seized from Grasso was admitted into evidence. Probable cause is to be based upon practical and factual considerations of everyday life on which reasonable and prudent men, not legal technicians act. Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), quoted in United States v. 1964 Ford Thunderbird, 445 F.2d 1064, 1068 (3rd Cir. 1971), United States ex rel. Hollman v. Rundle, 329 F.Supp. 1052 (E.D.Pa.1971). See Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

█ Defendants contend that even if there was probable cause, the arresting officer should have obtained a warrant prior to making the arrests and therefore the warrantless arrests were invalid. To say on the one hand that there was no probable cause to arrest and on the other hand there was adequate

time to obtain a warrant prior to the arrest appears to be inconsistent. Until the securities were actually transferred to the agent, he only had reason to believe that a crime was about to be committed. To require a delay in order to obtain a warrant after the securities were finally turned over (the date, time and place being unknown in advance to the agent), might well have permitted all defendants to escape possibly with the money. *See* Coolidge v. New Hampshire, 403 U.S. 443, 459–60, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); United States v. Kelley Davis a/k/a Tee Inez Davis, 461 F.2d 1026 (3rd Cir. 1972). As to the arrest of Weinberg, which occurred at his office about an hour after the arrest of the other defendants, there would appear to have been adequate time to obtain a warrant for his arrest and no explanation was given for failure to obtain such a warrant. For this reason, I suppressed any and all evidence seized from Weinberg at the time of his arrest. There having been probable cause and reasonable grounds for the arrest of the other defendants without a warrant, the government's search and seizure of evidence from the persons of the defendants was permissible. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

 Weinberg's counsel further contends that any statements made by Weinberg to the agent during the course of the agent's investigation and prior to Weinberg's arrest, were inadmissible by reason of the failure to give Weinberg "Miranda" warnings. It is clear that Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and cases subsequent thereto, refer only to "custodial interrogations" which means "questioning initiated by law enforce-ment officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612. The statements by Weinberg to the investigating officer were clearly made at times when Weinberg was not in any way restrained of his freedom; they were not "confessions"; and they were obviously voluntary and uncoerced. To extend *Miranda* as contended by defendant, would completely frustrate undercover police investigations.

## SEVERANCE

 Defendants contend their rights were prejudiced by reason of their trials being consolidated. Rules 13 and 14 of the Federal Rules of Criminal Procedure (1971), grant wide discretion to the trial court in consolidating indictments for trial; the consolidation will be upheld unless a defendant is thereby prejudiced. United States v. Weber, 437 F.2d 327, 331 (3rd Cir. 1970), cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971). Although each of the defendants in this case may have had somewhat different theories of defense, they were not inconsistent with each other as all denied their participation in any conspiracy. No defendant testified against another defendant with the exception of Chilengarian who had previously entered a plea of guilty and was not tried with the others. No *Bruton* confessions or statements were admitted.[12] The defendants themselves benefited from the joint trial to the extent that I indicated that an objection by one counsel could be deemed as an objection by all counsel. This ruling was utilized to full advantage by all defense counsel throughout the trial and in arguing post trial motions.

## MISCELLANEOUS CONTENTIONS

 Defendants, or some of them, have raised several other minor issues.

---

12. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Objection was taken to the refusal of the court to sequester the agent. The agent who was the chief prosecuting witness was of assistance to the prosecuting attorney in presenting the testimony in an orderly and proper fashion. All other witnesses were excluded from the trial until after they had testified. The agent testified as the second witness and clearly his testimony was not "tailored" on the basis of any testimony he had previously heard. This contention lacks merit. United States v. Frazier, 417 F.2d 1138 (4th Cir. 1969), cert. denied, 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970), rehearing denied, 398 U.S. 945, 90 S.Ct. 1850, 26 L.Ed.2d 284 (1970).

Defendants also object because several witnesses at one time or another referred to the securities as stolen. In the several incidental references so made by any witness, upon objection by counsel, the jury was given a cautionary instruction to disregard such references because a statement that the securities were stolen was not proof of the theft or of the defendants' guilt. No motion for withdrawal of a juror was made.

■ There was an indirect reference to the word "criminal" in answer to a question on cross-examination by one of the secret service agents who observed a conversation between the prosecuting agent and Weinberg. The agent explained his covert presence as follows: "I was there to cover the agent. We don't have an agent unprotected when he is meeting with criminals." (8–128). There was no reference to any prior criminal conduct or prior criminal record of any individual defendant. It was simply a statement of the general policy of the secret service to protect other agents from suspected criminals. The objection by defense counsel was immediately sustained and the jury was charged that the inadvertent comment was not meant to infer and could not infer that the defendants or any of them were criminals. There was no motion made for a mistrial.

This statement was inappropriate but in view of the immediate cautionary statement to the jury with the specific instruction that this did not indicate that any of the defendants were criminals, it was insufficient to cause a mistrial, especially since no motion for the same was made. To terminate a trial in the absence of a defense motion or defense consent, usually prevents a re-trial as "double jeopardy", thus resulting in an acquittal. See United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949); United States v. Perez, 22 U.S. 579, 9 Wheat. 579, 6 L.Ed. 165 (1824).

Another contention, without merit, is that the government was permitted to cross-examine its own witness, Chilengarian. The government sought to refresh the recollection of Chilengarian by allowing him to review his grand jury testimony on the theory of surprise and also sought to cross-examine him as a hostile witness. However, defendants objected to this procedure and the court expressly sustained the defendants' objection and prohibited the government from refreshing Chilengarian's recollection or from cross-examining him in any way. (6–80, 6–89). The argument is clearly without merit.

■ Objection was made to testimony of Agent McDonnell concerning various conversations he had with Weinberg and Gornish prior to proving the corpus delicti of the offenses charged. The "corpus delicti" rule applies to confessions by a defendant. The statements of various defendants in a conspiracy trial are often part of the proof of the conspiracy itself and as such part of the corpus delicti. In addition, in each instance, the jury was advised that the statement made by one defendant could not be used or considered by the jury against any other defendant until and unless independent of such statements,

the jury found that a conspiracy in fact existed.

 Another contention by Blank is that three of the jurors found him not guilty when the jury was polled. The reading of the polling of the jury will show that because Weinberg and Gornish were charged on two counts and Kasparian and Blank were charged only on the first count of conspiracy, that certain of the jurors inadvertently became confused when polled as to the separate counts and the separate defendants. In each instance upon inquiry from the court but without any pressure or suggestion from the court, the juror being so polled immediately corrected his finding. They were jurors Nos. 5, 7 and 10 and appear on 12–97, 12–99 and 12–102. At the conclusion of the polling of the jury, the court again addressed the jurors in order to be positive that they fully understood their verdict and that the recording of their guilty verdict as to Count #1 concerning Blank was what they intended. (12–104, 105). No exception was taken or question raised by defense counsel at the time nor was any request made for the jury to make any further return or finding. The verdict as recorded was in conformity with that announced by the foreman and it is clear that Blank was convicted by a unanimous jury verdict. In addition, the failure to object to the form of the jury verdict prior to the jury's discharge constituted a waiver of any objection concerning the form of the verdict.[13] See Mitchell v. United States, 434 F.2d 230 (9th Cir. 1970); Posey v. United States, 416 F.2d 545 (5th Cir. 1969), cert. denied, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127, rehearing denied, 397 U.S. 1031, 90 S.Ct. 1267, 25 L.Ed.2d 544 (1970); Jackson v. United States, 128 U.S.App.D.C. 214, 386 F.2d 641 (1967).

---

13. The trial judge, after the jury was polled, stated that the verdict was that all four defendants were guilty on the conspiracy count, and none guilty on the second count. The judge then asked counsel: "Gentlemen, is there any question about the polling of the jury." There was no response (12–105).