**UNITED STATES of America**

**v.**

**Alan WEINBERG et al., Appellant in No. 72–1784.**

**Appeal of Nathan BLANK, in No. 72–1782.**

**Appeal of Edward GORNISH, in No. 72–1783.**

**Appeal of George KASPARIAN, in No. 72–1785.**

**Nos. 72–1782–72–1785.**

United States Court of Appeals, Third Circuit.

Argued March 20, 1973.

Decided May 22, 1973.

---

Joseph A. Torregrossa, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellant in No. 72–1782.

Harry S. Tischler, Defender Assoc. of Phila., Philadelphia, Pa., for appellant in No. 72–1783.

Malcolm H. Waldron, Jr., Philadelphia, Pa., for appellant in No. 72–1784.

Mitchell S. Lipschutz, Philadelphia, Pa., for appellant in No. 72–1785.

Carl J. Melone, U. S. Atty., George S. Kopp, Criminal Division, Appellate Section, U. S. Dept. of Justice, Washington, D. C., for appellee.

Before SEITZ, Chief Judge and ALDISERT and ADAMS, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

The defendants appeal their sentences entered upon their conviction by a jury for conspiring to violate 18 U.S.C. § 2315 (1971). The alleged conspiracy was a plan to receive stolen securities and pledge them as collateral for a loan from a bank.[1]

I. SUFFICIENCY OF THE EVIDENCE—THE JURISDICTIONAL AMOUNT ELEMENT OF AN 18 U.S.C. § 2315 OFFENSE

18 U.S.C. § 2315 (1971)[2] contains a jurisdictional amount element which requires the securities allegedly "received or disposed of" to have "the value of $5,000 or more." The defendants maintain the Government failed to produce sufficient evidence that the securities (two certificates representing 3,745 shares of common stock of Chrysler Corporation) were in excess of the jurisdictional amount requirement.

The evidence, viewed most favorably to the Government, established that the brokerage firm, upon discovery of the theft, placed a "stop" on the two certificates; the defendants at the time of the conspiracy did not know the certificates had been "stopped" nor could knowledge of the stop be imputed to the bank since the federal agent who was posing as the bank's loan officer did not know of the stop; all parties stipulated that during the year of the theft the market value of 3,745 shares of common stock of Chrysler Corporation on the New York Stock Exchange was at least $60,000; and the defendants negotiated for a loan of $40,000 for the pledge of the securities.

The district court instructed the jury that the value of the shares at the date of receipt or disposition was controlling and the jury should determine whether the stock then was worth $5,000 or more.

Defendants contend there was insufficient evidence to establish that the value of the Chrysler stock in question exceeded the jurisdictional amount of $5,000 at the time of the securities' receipt or disposition by the defendants. They recognize the parties stipulated as to the market value of Chrysler stock generally but point out there was no evidence before the jury as to the effect of the stop or-

1. For an excellent discussion of the facts in detail, see United States v. Weinberg, 345 F.Supp. 824 (E.D.Pa.1972).
   Several of the defendants were also charged with a substantive violation of 18 U.S.C. § 2315, but the jury found them not guilty of this offense.

2. 18 U.S.C. § 2315(¶ 1) (1971): "Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken [shall 'be fined not more than $10,000 or imprisoned not more than ten years, or both']."

der on the value of the stolen stock at the critical date as charged by the court.

■■ We need not decide the legal correctness of the district court's instruction to the jury that "value" is to be determined as of the time of the receipt or disposition of the property.[3] Defendants did not challenge the charge on this point either in the district court or here. Nor need we decide whether the Government's proof of market value was deficient for failure to show the effect of the stop order on such shares. We say this because, at the Government's behest, the stock certificates in question were admitted in evidence. Those certificates, representing 3,745 shares, recite that the shares are of the par value of Six Dollars and Twenty-five Cents each. Thus, their par value far exceeded $5,000 and fulfilled one of the permissible statutory definitions of "value" found in 18 U.S.C. § 2311 (1971). Because the par value was an indisputable fact of record which fulfilled the jurisdictional amount requirement, under the circumstances, we do not regard it as significant that there was no reference to it in the instructions to the jury.

## II. HEARING AND DETERMINATION DURING TRIAL ON A MOTION TO SUPPRESS MADE *BEFORE* TRIAL

Well before trial, the defendants filed motions to suppress various evidence on the grounds that their arrests and subsequent searches were improper pursuant to Fed.R.Crim.P. 41(e) (1971).[4] However, no suppression hearing was held, nor, consequently, was any determination made on these motions prior to trial. In fact, a fair amount of testimony was taken before the court heard and disposed of the motions. Although the challenged evidence was not "admitted" in evidence until after the suppression hearing and determination, some witnesses were questioned concerning it in the presence of the jury, prior to the hearing. Later in the Government's case, the district court did conduct a suppression hearing out of the presence of the jury. It then decided that there were no infirmities in the arrests and subsequent searches and that the challenged evidence would be properly admissible in evidence.

■ The defendants contend the suppression hearing and determination during trial could not have resulted in a fair determination on their pretrial motions to suppress. We think the rulings on these motions could and should have been made before evidence was taken. However, we believe the error was harmless because all the evidence challenged in the defendants' motions was properly admissible. We are unwilling to assume that the court's determination was influenced by the posture of the case at the time he ruled. We emphasize that a pretrial determination avoids the creation of such an impression and should be the general rule absent unusual circumstances.

## III. DISCLOSURE OF THE INFORMANT'S NAME AND WHEREABOUTS

■ The defendants contend the Government failed to properly discharge its obligation under the facts presented to

---

3. In its opinion denying posttrial motions, the district court shifted its position from that taken in its charge and held that the date of the original theft controlled and that there was undisputed evidence of value in excess of the jurisdictional amount at that time. United States v. Weinberg, 345 F.Supp. 824, 833 (E.D.Pa.1972). Since this was not the district court's position in the jury instruction, we need not decide whether the court's later version of the law is correct.

4. In 1972, Fed.R.Crim.P. 41(e) (1971) (Motion for Return of Property and To Suppress Evidence) was amended and now comprises Fed.R.Crim.P. 41(e) (Motion for Return of Property) and 41(f) (Motion To Suppress). Fed.R.Crim.P. 41(f) (1972) states: "A motion to suppress evidence may be made in the court of the district of trial as provided in Rule 12." Our holding is equally applicable to a motion to suppress made pursuant to the 1972 Rule 41(f).

disclose the name and whereabouts of the informant.

After a review of the record, we find the district court correctly stated: "It is clear [that the defendants] knew the informer's identity at the time of trial." 345 F.Supp. at 835. Thus, the defendants' contention that the Government failed to satisfy the requirement to disclose the informant's name is without support.

As to the informant's whereabouts, the defendants argue that although they had two addresses of the informant, a private investigator employed by the defendants had discovered that the informer had moved from those addresses and no forwarding address was known. However, the investigator made this discovery over a month before the trial; yet as the district court noted, the defendants did not bring the matter to the attention of the district court until after trial.

We conclude that the Government fully complied with the "whereabouts" disclosure requirement.

## IV. THE TESTIMONY OF THE AGENT-LOAN OFFICER BASED ON HIS REPORTS

The investigation of the conspiracy commenced around November 24, 1970 and culminated with the arrest of the defendants on December 14, 1970. During the period of the investigation, the agent made no written notes concerning the investigation. Thereafter, he prepared three investigative reports; one was written on December 22, 1970 and the other two on January 14, 1971. On February 25, 1971, the agent distilled the three investigative reports into a summary report. The three investigative reports and the summary report were made available to the defendants at trial.

In testifying at trial, the agent relied heavily on the summary report "to refresh his recollection." The district court stated: "The agent . . . was permitted to examine his notes repeatedly before testifying as to the precise meetings and details of the meetings with certain of the defendants." 345 F. Supp. at 834. The defendants argue that the summary report was not made contemporaneously with the events in question, and thus the agent should not have been permitted to use the summary report to refresh his recollection.

■■ We find the three investigative reports prepared within one month of the end of the investigation were made roughly contemporaneously with the events. *Id.*[5] Since the summary report was a distillation of the three "contemporaneous" investigative reports which were available to defendants, we fail to see how defendants were prejudiced by the witness' use of this document to refresh his recollection.

■ Alternatively, the defendants maintain that the agent, in effect, "read" the summary report into the record through his testimony and that the agent had no recollection independent of the written report. However, the district court stated that it was "satisfied from all of the testimony presented by the agent that he was refreshing his recollection for the purpose of being entirely accurate in the details of his testimony." *Id.* After a review of the record, we find that the district court did not abuse its discretion in permitting the agent to examine the summary report to refresh his recollection and that the report was referred to by the agent solely for that purpose.

## V. KASPARIAN—SUFFICIENCY OF THE EVIDENCE

■ In considering the question of the sufficiency of the evidence concerning Kasparian, the district court stated that Kasparian had the following three contacts with the conspiracy transaction:

[1] Kasparian originally contacted Chilengarian about the possibility of

---

5. We think, when feasible, such reports should be prepared immediately after the events they purport to reflect.

Chilengarian's 'going into a new car agency' through a contact of Kasparian's. . . . [2] Kasparian telephoned to Chilengarian that he had been asked to advise him that the final arrangements could not be made until the next week. [3] Kasparian was present during the final drive to the bank and was present when the securities were transferred by Blank to Chilengarian and he looked at them.

345 F.Supp. at 830.[6]

The district court concluded these three contacts were sufficient evidence to uphold the conviction of Kasparian:

[T]he numerous contacts that Kasparian had in the transaction which furthered the conspiracy and the actual transfer of the securities were such that a jury could reasonably find from all the surrounding circumstances that Kasparian was an active participant and an integral part of the conspiracy beyond a reasonable doubt.

*Id.*

After reviewing the testimony concerning Kasparian's participation, we find no evidence to support a conclusion that Kasparian had knowledge he was part of a conspiracy to receive and pledge stolen securities. All of Kasparian's conduct was consistent with his innocence and his defense that he was simply attempting to assist Chilengarian to open a new car agency.

First, Chilengarian had previously told Kasparian that he was interested in going into a new car agency. He asked that if Kasparian knew of any person similarly interested who had funds available that Kasparian should put that individual in contact with him. Later, defendant Gornish allegedly asked defendant Blank if he knew of someone in the automobile business who wanted to start an agency. Blank mentioned to Kasparian the inquiry of Gornish. Thereafter, Kasparian contacted Chilengarian and introduced him to Blank; this conduct of Kasparian was not inconsistent with his assertion that he believed he was just aiding in a legitimate business transaction.

Secondly, Kasparian's telephone call to Chilengarian, in which Kasparian allegedly stated it would be perhaps the following week when the final transaction would be made at the bank, provided no evidence concerning Kasparian inconsistent with a legitimate loan transaction for Chilengarian's business.

The final contact was Kasparian's presence in Blank's car during the drive to the bank, his witnessing Blank's transfer of the securities to Chilengarian, and Kasparian's observation of these certificates. Again, Kasparian's conduct was consistent with a car ride with his friend Blank to finalize a legitimate business transaction; nothing in the testimony concerning the drive to the bank could be interpreted as indicating that Kasparian knew this loan transaction was not legitimate. It is undisputed that Kasparian remained in the car while Chilengarian and the informant entered the bank to pledge the securities.

Given the obligation of the Government to prove guilt beyond a reasonable doubt, we find as a matter of law that the evidence as to Kasparian was insufficient to sustain the conviction.

We have considered the other contentions raised by the defendants and find them without merit.

The judgment of the district court as to defendant-appellant Kasparian will be reversed and its judgments as to the other defendants-appellants will be affirmed.

---

6. The district court also mentioned a fourth contact: "Kasparian introduced Chilengarian to the informer." 345 F.Supp. at 830. The testimony indicated Kasparian introduced Chilengarian to Blank and then Blank introduced Chilengarian to the informer, but we find no testimony that Kasparian introduced Chilengarian to the informer nor does the Government refer us to any such testimony.